JAMES D. COHEN ET AL. *v.*
ROLL-A-COVER, LLC,
ET AL.
(AC 32430)

DiPentima, C. J., and Gruendel and West, Js.

444

Argued March 17—officially released September 20, 2011

*Joseph L. Rini,* with whom, on the brief, was *Michael P. Morris,* pro se, for the appellants (defendants).

*James D. Cohen,* pro se, the appellee (named plaintiff).

*Michael T. Bologna,* for the appellee (plaintiff Roll-A-Cover of New Jersey, LLC).

*Opinion*

WEST, J. The defendants, Roll-A-Cover, LLC, and Michael P. Morris, appeal from the judgment of the trial court rendered in favor of the plaintiffs, James D. Cohen and Roll-A-Cover of New Jersey, LLC.[1] On appeal, the defendants claim that the court improperly (1) found facts that were not supported by the evidence when it determined that the plaintiffs had proven fraud and negligent misrepresentation; (2) found multiple violations of the Connecticut Business Opportunity Investment Act (business opportunity act), General Statutes § 36b-60 et seq.; (3) found a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.;[2] and (4) calculated the damages award in accordance with General Statutes § 36b-74 (a). We affirm the judgment of the trial court.

The following facts, as found by the court, and procedural history are necessary for our resolution of the defendants' appeal. The defendants are engaged in the manufacturing and sales of a product called "Roll-A-Cover," a retractable enclosure for swimming pools and spas. While traveling in the fall of 2003, Cohen read an in-flight magazine advertisement that described the defendants' products in addition to potential opportunities for distributorships. Cohen, a New Jersey resident, contacted the defendants and set up a meeting at their manufacturing facility located in Bethany to acquire more information. During that initial meeting, Cohen

---

[1] We note that on appeal to this court, both plaintiffs have filed separate briefs. We further note that certain portions of each of the plaintiffs' appendices have been stricken pursuant to an order from this court dated February 9, 2011.

[2] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

met with Morris, the founder and president of Roll-A-Cover, LLC, in addition to other agents of the defendant company. From November, 2003, through January, 2004, Cohen engaged in negotiations with Morris and agents of Roll-A-Cover, LLC, regarding the possibility of acquiring an exclusive distributorship for Roll-A-Cover, LLC, products in New Jersey. As part of their effort to induce Cohen into purchasing a distributorship for New Jersey, the defendants presented him with a marketing plan and business program that, at the time, they knew, contained a myriad of factual misrepresentations and material untruths. During the negotiations, Cohen was told that the only means of obtaining a distributorship was to pay a fee of $75,000 and to participate in a pyramid marketing program. Morris communicated to Cohen that the defendants were in negotiations with potential distributors worldwide and that Roll-A-Cover, LLC, recently had sold distributorships in Florida and five different countries in Southeast Asia.[3] At the time that those representations were made, there were no such sales of distributorships at any of those locations. The defendants possessed only two distributors of its products, and neither paid a fee for the distributorship, nor were they subject to the type of pyramid marketing program that was being proposed to Cohen. The defendants also purported falsely to have a high volume sales history and a backlog of pending sales. They further represented that they held six patents and at least four trademarks on their products. At the time, the defendants did not possess either patent or trademark rights on any of their products. Moreover, the defendants misrepresented their product's ability to withstand certain wind velocities and snow loads in their attempt to present a superior product. Furthermore, the defendants

---

[3] Specifically, the court found that Morris communicated to Cohen that the defendants had recently "sold a distributorship for Singapore, Thailand, Malaysia, Indonesia and Brunei."

prepared and presented a marketing and sales brochure that contained false and misleading information.[4] The brochure also contained photographs and descriptions of pool enclosures that the defendants represented to be their own products. At the time, however, they were fully aware that some of the photographs and descriptions of those enclosures were not manufactured by Roll-A-Cover, LLC, but rather, by a different company. The defendants' website also disseminated a variety of factual misrepresentations that increased the plaintiffs' reliance on the erroneous information.[5]

Relying on the aforementioned misrepresentations, Cohen formed Roll-A-Cover of New Jersey, LLC, and entered into a master distributorship agreement (distributorship agreement) that provided Roll-A-Cover of New Jersey, LLC, with exclusive distributorship rights for the state of New Jersey in return for a fee of $75,000.[6] Prior to the execution of the agreement, the plaintiffs were denied access to any documentation regarding the sales history of Roll-A-Cover, LLC, because of the defendants' position that the information was proprietary and unavailable. Thereafter, the business relationship between the parties deteriorated quickly and ended

---

[4] In its memorandum of decision, the court found that "the *plaintiffs* prepared and utilized a marketing and sales brochure . . . that contained false and misleading information." (Citation omitted; emphasis added.) After reviewing the record, and, more specifically, the context in which the court's findings were articulated, we conclude this to be a typographical error and that the court attributed the preparation of the brochure to the defendants.

[5] For example, the court found that the defendants' website contained a sixty-five page list of alleged "U.S. Dealers" that was intended to give the impression that the defendants had established an exclusive dealership network nationwide. In reality, however, none of the companies listed had an existing contractual relationship with the defendants or were exclusive dealers in the defendants' products.

[6] The agreement was later amended to include Delaware. Pursuant to the terms of the agreement, the plaintiffs would be responsible for establishing dealerships within those territories that would market, sell and install the defendants' products.

in the fall of 2004 with each party sending the other a letter of termination regarding the distributorship agreement.

On April 7, 2005, the plaintiffs filed a nine count amended complaint, alleging, inter alia, fraud or intentional misrepresentation, fraudulent inducement, negligent misrepresentation, multiple violations under the business opportunity act and a violation of CUTPA.[7] In response, the defendants alleged four special defenses. On August 6, 2009, following a nine day court trial, the court issued a well reasoned memorandum of decision and found in favor of the plaintiffs on all counts. In a subsequent memorandum of decision, the court rendered its final judgment and awarded the plaintiffs $75,000 in compensatory damages, $350,000 in attorney's fees under the business opportunity act and CUTPA, and $150,000 in punitive damages under CUTPA. This appeal followed. Additional facts will be set forth as necessary.

## I

## FRAUD

The defendants first claim that the court improperly made findings of fact that were not supported by the evidence when it concluded that the plaintiffs had proven fraud, fraudulent inducement and intentional misrepresentation by clear, precise and unequivocal evidence.[8] We do not agree.

We begin by setting forth the appropriate standard of review. "Fraud and misrepresentation cannot be easily

---

[7] In their first amended complaint, the plaintiffs also alleged breach of contract and breach of the implied covenant of good faith and fair dealing. Those counts were withdrawn by the plaintiffs during the trial.

[8] The court also found that the plaintiffs had proven negligent misrepresentation by a preponderance of the evidence. See *Savings Bank of Manchester* v. *Ralion Financial Services, Inc.*, 91 Conn. App. 386, 387, 881 A.2d 1035 (2005) (standard of proof for negligent misrepresentation claim is preponderance of evidence).

defined because they can be accomplished in so many different ways. They present, however, issues of fact. . . . The trier of facts is the judge of the credibility of the testimony and of the weight to be accorded it. . . . When the trial court finds that a plaintiff has proven all of the essential elements of fraud, its decision will not be reversed or modified unless it is clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[9] (Citations omitted; internal quotation marks omitted.) *Harold Cohn & Co.* v. *Harco International, LLC*, 72 Conn. App. 43, 50–51, 804 A.2d 218, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002). "[A]s a reviewing court [w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . .

---

[9] We note that "[t]he essential elements of a cause of action in fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. . . . All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal." (Internal quotation marks omitted.) *Harold Cohn & Co.* v. *Harco International, LLC*, 72 Conn. App. 43, 51, 804 A.2d 218, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002).

Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *73-75 Main Avenue, LLC* v. *PP Door Enterprise, Inc.*, 120 Conn. App. 150, 158–59, 991 A.2d 650 (2010).

In the present case, the court found that the defendants made profuse "factual representations to the plaintiffs that were knowingly false when made, were made with the intent to deceive, and were relied on by the plaintiffs to their detriment in their execution or performance of the [agreement]." The defendants now mount a wholesale attack on all of the court's factual findings, asking this court to substitute its interpretation of the evidence and the credibility of witnesses in place of that of the trial court. "We have repeatedly stated that such wholesale attacks rarely produce results, tend to cloud the real issues, and in themselves cast doubts on the appellants' claims." *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 391, 363 A.2d 160 (1975); see also *Yale Literary Magazine* v. *Yale University*, 4 Conn. App. 592, 597, 496 A.2d 201 (1985), aff'd, 202 Conn. 672, 522 A.2d 818 (1987). Moreover, when there is conflicting evidence, it is left to the discretion of the fact finder to decide which evidence to find credible. *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 530, 562 A.2d 1100 (1989). We have, nevertheless, conducted a thorough review of the record and conclude that the court's findings were supported by evidence in the record and are not clearly erroneous.

Because findings of fact will not be disturbed if they are reasonably supported by the evidence or the reasonable inferences drawn from the facts proven; see id.; we underscore the following evidence presented at trial to support the trial court's findings. In December, 2003, Morris sent an e-mail to Cohen, stating, "[t]oday, I *finalized* a Master Distributorship in Singapore, Thailand, Malaysia, Indonesia and Brunei. Tomorrow we are

entertaining our *newly agreed to Master Distributor's of Florida.*" (Emphasis added.) When questioned about this correspondence, Morris provided equivocal testimony regarding what he intended by using the words "finalized" and "newly agreed" and further admitted that the defendants did not have distributorships *in any of the aforementioned locations at the time he made the representation to Cohen.* Cohen also testified that he was told by Morris that the defendants had many distributors, when in fact there were only two. Consequently, the court found that the defendants purposely misrepresented to Cohen that they had recently sold distributorships in Florida and Southeast Asia. The defendants argue that because neither party used the word sold, there was insufficient evidence to support this finding by the court. The court, however, was free to draw whatever inferences it deemed reasonable and logical from the evidence presented to it. See *State* v. *Golder,* 127 Conn. App. 181, 192, 14 A.3d 399 ("[t]he [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical" [internal quotation marks omitted]), cert. denied, 301 Conn. 912, 19 A.3d 180 (2011). Given that the court was in the best position to assess Morris' demeanor when attempting to explain what he meant by those inconsistent communications, we conclude that it was reasonable and logical for the court to infer that Morris misrepresented to Cohen that the defendants had recently "sold" distributorships in these locations.[10] See *73-75 Main Avenue, LLC* v. *PP Door Enterprise, Inc.,* supra, 120 Conn. App. 158–59.

---

[10] The court also found that Morris had misrepresented to Cohen that it was urgent for him to make a decision on purchasing the rights to the New Jersey territory because there were other parties interested in that area. In a letter dated November 21, 2003, Morris informed Cohen that the only way that he would be able to "secure this opportunity" and delay Morris' correspondence with "other interested parties" would be to execute a letter of intent along with a security payment. Thomas Dannenhoffer, vice president of Roll-A-Cover, LLC, testified that, despite being involved in the negoti-

The court also found that the defendants misrepresented to the plaintiffs that the defendants had a high volume sales history and a backlog of pending sales. Cohen testified that he was told by the defendants during one of his initial visits to the Bethany manufacturing facility that the defendants were selling a significant amount of pool enclosures. He was presented also with a sales and marketing brochure that stated that as a result of the "enormous success" regarding the sales of the defendants' products, they were experiencing a "[twelve] week delivery backlog." Evidence presented to the court, however, revealed that despite a two year effort by the defendants to market and sell their products, it appeared that the defendants had managed to sell only a small number of enclosures by the fourth quarter of 2003.

The court also found that the distribution agreement between the parties, the defendants' website and verbal communications from the defendants all misrepresented to the plaintiffs that the defendants held six patents and four trademarks on their products. Morris admitted that at the time the representations were made to the plaintiffs, the defendants did not have any federally registered trademarks or patents on any of their products. Additionally, the court found that the defendants misrepresented to the plaintiffs their product's ability to withstand the elements. Raffaele Aschettino, a structural engineer contracted to perform a structural analysis of the defendants' products, testified that the defendants' representations in their brochure concerning their product's ability to withstand wind velocities up to 120 miles per hour and snow loads up to seventy pounds were inconsistent and did not conform to his calculations. Cohen testified that prior to purchasing

ations with Cohen and Morris, he was unaware of any other party, except Cohen, being interested in the New Jersey area.

the distributorship, he relied on the defendants' representations that the products pictured at the Bethany manufacturing facility and in the sales brochure given to him were products manufactured by the defendants. Morris, however, admitted that some of the photographs of the pool enclosures that were contained in the brochure were enclosures that had not been manufactured by the defendants. On the basis of the foregoing, we conclude that the court's findings have ample support in the record, and we are not left with a definite and firm conviction that a mistake has been committed.[11] Accordingly, the defendants' claim fails.

II

## CONNECTICUT BUSINESS OPPORTUNITY INVESTMENT ACT

The defendants next claim that the court improperly found that they violated multiple provisions of the business opportunity act. In support of that claim the defendants posit that they neither sold, nor offered for sale, a business opportunity pursuant to § 36b-60 et seq. In the alternative, they contend that the court improperly rejected certain special defenses that alleged that they were exempt from the provisions of the business opportunity act. We are not persuaded and will address each argument in turn.

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When,

---

[11] All of the defendants' remaining arguments regarding this claim ask us to retry the facts, or pass on the weight to be accorded to the testimony, or to assess the credibility of the witnesses in a similar vein. This we will not do. Our duty is solely to determine whether the court's factual findings were clearly erroneous, or if the judgment was contrary to law. See *Colonial Bank & Trust Co.* v. *Matoff*, 18 Conn. App. 20, 31–32, 556 A.2d 619 (1989).

however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." *Morton Buildings, Inc.* v. *Bannon,* 222 Conn. 49, 53, 607 A.2d 424 (1992).

The following additional facts are necessary for our resolution of this particular claim. In its memorandum of decision, the court found, by a preponderance of the evidence, that the defendants violated the business opportunity act by (1) failing to register the business opportunity with the banking commissioner as required by General Statutes §§ 36b-62 and 36b-67 (1); (2) failing to provide the plaintiffs with a disclosure document as required by General Statutes § 36b-63; (3) failing to provide balance sheets, income statements and changes in financial conditions as required by General Statutes (Rev. to 2003) § 36b-65 (b); (4) representing income or earning potential of the business opportunity without providing documentation and data substantiating that representation in violation of § 36b-67 (2); and (5) making untrue statements of material fact pursuant to the sale or offer for sale of the business opportunity in violation of § 36b-67 (6) (B).

Although not widely interpreted by our courts, "[t]he [business opportunity act] was enacted with the purpose of preventing the misrepresentations and fraudulent practices involved in business opportunity investment sales and the financial losses and hardships to investors which result therefrom. . . . Its requirements include registration of business opportunities with the Connecticut Banking Commissioner (commissioner) prior to sale [and] disclosure of information to prospective purchasers to enable them to make a rational purchase decision . . . ." (Citation omitted; internal quotation marks omitted.) *Eye Associates, P.C.* v. *Incomrx Systems Ltd.,* 912 F.2d 23, 25–26 (2d Cir.

1990). At the time, General Statutes (Rev. to 2003) § 36b-61 (6) defined business opportunity as "[t]he sale . . . or offer for sale . . . of any products, equipment, supplies or services which are sold or offered for sale to the purchaser-investor for the purpose of enabling the purchaser-investor to start a business, and in which the seller represents . . . (D) that the seller will provide a sales program or marketing program to the purchaser-investor . . . ."[12] When a seller is found in violation of certain provisions of the business opportunity act, a purchaser-investor can void the contract and recover from the seller all sums paid to such business opportunity seller in addition to damages and reasonable attorney's fees pursuant to § 36b-74 (a) and (b).[13]

## A

The defendants' first argument relevant to this claim is that paragraph 49.0 of the distributorship agreement operates to exclude the contract from the purview of the business opportunity act because the language contained in that clause established that the distributorship agreement was not a business opportunity as defined by § 36b-61 (6).[14] We disagree.

---

[12] General Statutes (Rev. to 2003) § 36b-61 (6) was subsequently amended by Public Acts 2009, No. 09-160, § 1, and the language relied on by the trial court is codified currently in § 36b-61 (2).

[13] General Statutes § 36b-74 (a) provides in relevant part: "If a business opportunity seller uses any untrue or misleading statement in the sale of a business opportunity, or fails to give the proper disclosures in the manner required by section 36b-63 . . . the purchaser-investor may void the contract and shall be entitled to receive from such business opportunity seller all sums paid to such business opportunity seller. . . ."

General Statutes § 36b-74 (b) provides in relevant part: "Any purchaser-investor injured by a violation of sections 36b-60 to 36b-80 . . . may bring an action for recovery of damages, including reasonable attorney's fees."

[14] General Statutes (Rev. to 2003) § 36b-61 (6) provides in relevant part: " 'Business opportunity' means the sale or lease, or offer for sale or lease, of any products, equipment, supplies or services which are sold or offered for sale to the purchaser-investor for the purpose of enabling the purchaser-investor to start a business, and in which the seller represents . . . (D) that the seller will provide a sales program or marketing program to the purchaser-investor . . . ."

When, as is the case here, there is definitive contract language that has been interpreted by the court, the determination of what the parties intended by their contractual commitments is a question of law over which our review is plenary. *Aaron Manor, Inc.* v. *Irving*, 126 Conn. App. 646, 653, 12 A.3d 584, cert. granted on other grounds, 301 Conn. 908, 19 A.3d 178 (2011).

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) *Electric Cable Compounds, Inc.* v. *Seymour*, 95 Conn. App. 523, 529, 897 A.2d 146 (2006).

Paragraph 49.0 of the distribution agreement provides in relevant part: "Distributor / Roll-A-Cover warrants represents and agrees that this agreement is not

General Statutes (Rev. to 2003) § 36b-61 (5) (A) defines a sale in relevant part as "every contract of sale of, contract to sell, or disposition of a business opportunity or interest in a business opportunity for value. (B) 'Offer' or 'offer to sell' includes every attempt or offer to dispose of, or solicitation of an offer to buy, a business opportunity or interest in a business opportunity for value. Nothing in this subdivision shall limit or diminish the full meaning of the terms 'sale', 'sell', 'offer' or 'offer to sell' as construed by the courts of this state."

a franchise, under the laws of the State of Connecticut or any other jurisdiction, which might be applicable to Distributor. . . . Distributor represents that the Products are one of several products or services sold by Distributor and these Products do not constitute the sole or substantial source of sales by the Distributor." The defendants now claim that this language operates to exclude the distributorship agreement from the provisions of the business opportunity act because it contains false statements and proves that the plaintiffs were not intending to start a new business. This argument, however, ignores the remaining forty-eight paragraphs contained in the distributorship agreement that establish clearly that the defendants were offering, and the plaintiffs were purchasing, a distributorship in consideration of a payment of $75,000.[15] See General Statutes (Rev. to 2003) § 36b-61 (6). When the distributorship agreement is viewed in its entirety, as it was correctly analyzed by the court, the language is clear and unambiguous that the intent of the parties was to create a new business in which the plaintiffs would distribute and sell the defendants' products. See *Electric Cable Compounds, Inc.* v. *Seymour*, supra, 95 Conn. App. 528–29. As a result, we agree with the court's conclusion that there was no rational basis to interpret paragraph 49.0 as disavowing that a business opportunity had been created as defined by § 36b-61 (5) (A) and (6). When paragraph 49.0 is read within the context of the entire distributorship agreement, the defendants' claim that it nullified the creation of a new business opportunity is untenable. See footnote 12 of this opinion. Accordingly, we conclude that the court's conclusion was

---

[15] For example, the distributorship agreement provides in relevant part: "This agreement defines the responsibilities of a distributor. The Distributor will work in good faith with Roll-A-Cover to execute a marketing and distribution program jointly developed . . . . The balance of the Distributor fee of $75,000 is due upon execution of this agreement." Thereafter, the distribution agreement details the plaintiffs' obligations and rights as a distributor of the defendants' products.

legally and logically correct and was supported by the facts that appear in the record.

## B

In the alternative, the defendants argue that the court improperly rejected their special defense that alleged that the plaintiffs were precluded from recovering damages under the business opportunity act because their complaint, filed with the commissioner of banking, contained false and misleading statements in violation of General Statutes (Rev. to 2003) § 36b-80.[16] We are not persuaded.

To support this argument, the defendants claim that by submitting a copy of the distributorship agreement, along with their complaint to the commissioner of banking, the plaintiffs were precluded from recovery under § 36b-74 (h) because paragraph 49.0 of the agreement contained false and misleading statements.[17] The court rejected this defense and found that the defendants

---

[16] General Statutes (Rev. to 2003) § 36b-80 provides: "No person shall make or cause to be made orally or in any document filed with the commissioner or in any proceeding, investigation or examination under sections 36b-60 to 36b-80, inclusive, any statement which is, at the time and in the light of the circumstances under which it is made, false or misleading in any material respect."

The court noted "that the plaintiffs filed a complaint with the commissioner of banking alleging the defendants' violation of the [business opportunity act]. These administrative proceedings were resolved through the entry of a consent order executed by the defendants." That consent order, dated February 16, 2007, from the department of banking, states in relevant part: "[The defendants], through [their] agent Morris, as [p]resident . . . sold unregistered business opportunities in violation of [§] 36b-67 (1) . . . which constitutes a basis for an order to cease and desist pursuant to [§] 36b-72 (a) . . . ."

[17] General Statutes § 36b-74 (h) provides in relevant part: "No person who has made or engaged in the performance of any contract in violation of any provision of sections 36b-60 to 36b-80 . . . or who has acquired any purported right under such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any cause of action on the contract."

failed to prove by a preponderance of the evidence that the plaintiffs made any false or misleading statements to the banking commissioner pursuant to § 36b-80.[18] The defendants are asking us to review a factual finding by the court; therefore, our review is guided by the clearly erroneous standard. See *Morton Buildings, Inc.* v. *Bannon,* supra, 222 Conn. 53.

On appeal, the defendants merely rehash the arguments presented to the court, namely, that paragraph 49.0 of the distributorship agreement contains false statements, and have failed to point this court to any additional facts in the record or to cite to any authority to support their argument that the court's finding was clearly erroneous. After a thorough review of the record, we conclude that the court's finding that the defendants failed to prove that the plaintiffs made false or misleading statements to the commissioner of banking was not clearly erroneous, and we are not left with a definite and firm conviction that a mistake was made.[19] See part II A of this opinion.

---

[18] The plaintiffs submitted the agreement to the commissioner as part of their complaint alleging that the defendants violated the business opportunity act.

[19] The defendants also argue that the court improperly rejected their third special defense as to the first two counts of the plaintiffs' complaint, which alleged that the defendants were exempt from liability pursuant to § 36b-75 (c) because the execution of the distributorship occurred in New York, rather than Connecticut. In its memorandum of decision, the court found that, in addition to that claim being factually meritless, it had been abandoned by the defendants. We agree with the court that the defendants abandoned that issue at trial.

At the close of trial, the court ordered both parties to submit memoranda of law. Specifically, the court instructed the defendants to address their special defenses. In their posttrial memorandum of law, the defendants, however, failed to address the preceding issue, claiming that it had been bifurcated by the court. Although the court bifurcated the issue regarding § 36b-65 (e), it did not bifurcate the issue as it related to § 36b-75 (c). Accordingly, we decline review of this claim. See *Remillard* v. *Remillard,* 297 Conn. 345, 351, 999 A.2d 713 (2010) ("[i]t is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level" [internal quotation marks omitted]).

## C

The defendants next argue that the court improperly denied their request for further evidentiary proceedings pursuant to § 36b-65 (e) of the business opportunity act.[20] In particular, the defendants claim that § 36b-65 (e) (B) (2) provided an exemption for certain violations found under the business opportunity act if the investor-purchaser's net worth exceeded $1 million, and, therefore, an evidentiary hearing was required to flesh out the viability of this defense.[21] We disagree.

At a hearing on September 14, 2009, the defendants requested a further discovery schedule to determine the plaintiffs' net worth. The court denied that request on the ground that "[t]he exemption is not applicable as a matter of law because it does not exempt the prohibitions under § 36b-67 (6) (B), which are among the provisions [that] the court found were violated in this case."

At the outset, we note that where the legal conclusions of the trial court are challenged, our standard of review is plenary and we must decide whether such conclusions are legally and logically correct and find support in the facts that appear in the record.[22] *David Caron Chrysler Motors, LLC* v. *Goodhall's, Inc.*, 122 Conn. App. 149, 156, 997 A.2d 647, cert. granted on other grounds, 298 Conn. 925, 5 A.3d 486 (2010).

At the time that the court rendered its decision, the applicable revision of § 36b-65 (e) provided in relevant

---

[20] General Statutes (Rev. to 2003) § 36b-65 (e) was subsequently amended by Public Acts 2009, No. 09-160, § 5, and redesignated subsection (a).

[21] The court issued a decision bifurcating the discovery and adjudication of this issue until after trial.

[22] We note that this court typically applies the abuse of discretion standard of review when deciding whether the denial of an evidentiary hearing was proper; see *State* v. *Barnwell*, 102 Conn. App. 255, 263, 925 A.2d 1106 (2007); here, however, the defendants claim that the court's conclusions, namely, denying their alleged exemptions, were an error in law; therefore, our review is plenary. Id.

part that "[t]he following business opportunities are exempt from subsections (a) and (b) of section 36b-62; sections 36b-63 and section 36b-64 . . . section 36b-66 *and subdivisions (1), (2) and (3) of section 36b-67* . . . ."[23] (Emphasis added.) The statute further provided that any violations found under the aforementioned subdivisions would be exempt if the "business opportunity sold in this state exclusively to purchaser-investors each of whom has a net worth of not less than one million dollars exclusive of principal residence, home furnishings, and personal automobiles . . . ." General Statutes (Rev. to 2003) § 36b-65 (e) (B) (2). Even if we assume, without deciding, that § 36b-65 (e) would have precluded the court's authority to find violations of §§ 36b-62 (a), 36b-63, 36b-65 (b), and 36b-67 (1) and (2), the defendants have not demonstrated, pursuant to either the plain language of the statute or our appellate authority, how their liability under § 36b-67 (6) (B) would have been exempt, thereby affecting the result of the court's ruling. See *Gonzalez v. Commissioner of Correction*, 127 Conn. App. 454, 460, 14 A.3d 1053 (2011) ("[T]he harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . Generally, a trial court's ruling will result in a new trial only if the ruling was both wrong *and* harmful." [Emphasis in original; internal quotation marks omitted.]). Accordingly, we conclude that to the extent that any error occurred, it was harmless because the court's finding of liability would not have been affected, notwithstanding the asserted exemptions.[24]

---

[23] At the time that the court rendered its decision, § 36b-65 (e) provided only for exemptions under subdivisions (1) (2) and (3) of § 36b-67. It did not, however, exempt violations brought under § 36b-67 (6). As currently codified, § 36b-65 (a) exempts only subdivision (1) of § 36b-67. See Public Acts 2009, No. 09-160, § 5.

[24] Within the rubric of this claim, the defendants also argue, albeit cursorily, that any violations found on behalf Roll-A-Cover, New Jersey, LLC, cannot stand because Roll-A-Cover, New Jersey, LLC, did not render payment of the $75,000 distributor fee and, thus, was not a signatory to the distribution

## III

## CUTPA

The defendants next claim that the court improperly concluded that their conduct violated CUTPA. In support of this claim, the defendants argue that CUTPA is inapplicable because the plaintiffs did not incur an ascertainable loss within the state of Connecticut. The defendants also argue that Morris cannot be held individually liable pursuant to his capacity as an officer of the defendant company. We disagree.

We begin by setting forth the appropriate standard of review. "To the extent that the defendant is challenging the trial court's interpretation of CUTPA, our review is plenary. . . . [W]e review the trial court's factual findings under a clearly erroneous standard. . . . Appellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it

agreement. Alternatively, they also contend that they were exempt from the provisions of CUTPA because any offer made by them was not made in Connecticut. The court rejected these arguments and found that it was the express intent of the parties that Cohen negotiate the terms of the distributorship agreement on behalf of Roll-A-Cover, New Jersey, LLC. On appeal, the defendants assert that the court's finding with respect to these arguments is in direct conflict with New Jersey statutes. Other than bold assertions, however, the defendants do not offer any authority in support of their claims. We will not entertain abstract assertions absent any analysis. See *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, 119 Conn. App. 423, 444, 988 A.2d 351 (2010). Additionally, we note that "[a]ppellate pursuit of so large a number of issues forecloses the opportunity for a fully reasoned discussion of pivotal substantive concerns [by the appellant]. A shotgun approach does a disservice both to this court and to the party on whose behalf it is presented. . . . Naturally, an appellate court is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one [issue] . . . ." (Internal quotation marks omitted.) *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 263 n.2, 873 A.2d 208, cert. denied, 275 Conn. 905, 882 A.2d 668 (2005).

was legally correct and factually supported." (Internal quotation marks omitted.) *Blackwell* v. *Mahmood*, 120 Conn. App. 690, 702–703, 992 A.2d 1219 (2010).

A

The defendants first argue that the court improperly found that their conduct violated CUTPA because the plaintiffs failed to prove that they sustained or incurred an ascertainable loss within the state of Connecticut. We are not persuaded.

Because the defendants are challenging the trial court's interpretation of CUTPA, our review with respect to this argument is plenary. See id. "CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act . . . states merely that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, *the offering for sale* or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, *or thing of value in this state.* . . . The entire act is remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." (Emphasis added; internal quotation marks omitted.) *Kosiorek* v. *Smigelski*, 112 Conn. App. 315, 320–21, 962 A.2d 880, cert. denied, 291 Conn. 903, 967 A.2d 113 (2009). "While the plain language of CUTPA is directed at unfair competition taking place in this state . . . [federal authority in Connecticut has] held that CUTPA does not require that a violation actually occur in Connecticut, if the violation is tied to a form of trade or commerce intimately associated with Connecticut, or if, where Connecticut choice of law principles are applicable, those principles dictate application of Connecticut law. See *Uniroyal Chem. Co.* v. *Drexel Chem. Co.*,

931 F. Supp. 132, 140 (D. Conn. 1996) (citing, inter alia, *Bailey Employment Sys., Inc.* v. *Hahn*, 655 F.2d 473, 476 (2d Cir. 1981))." (Citation omitted; internal quotation marks omitted.) *Victor G. Reiling Associates & Design Innovation, Inc.* v. *Fisher-Price, Inc.*, 406 F. Sup. 2d 175, 200 (D. Conn. 2005). The statute further allows that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ." General Statutes § 42-110g (a).

Although the defendants concede, as they must, that any tortious conduct committed by a defendant within the state is actionable under CUTPA, they now claim circuitously that "for CUTPA to apply, a plaintiff must [also] prove that [the] loss was sustained and the economic impact [of that loss] was felt in Connecticut." Relying on federal authority; see *Bailey Employment System, Inc.* v. *Hahn*, supra, 655 F.2d 476; *Uniroyal Chemical Co.* v. *Drexel Chemical Co.*, supra, 931 F. Sup. 140; the defendants appear to argue that if we were to engage in a conflict of law analysis, CUTPA would be inapplicable because the ascertainable loss experienced by the plaintiffs was incurred in New Jersey. The defendants, however, misapply the principles under which we will engage in a conflict of law analysis. Additionally, their reliance on the holdings of *Uniroyal Chemical Co.* and *Bailey Employment System, Inc.*, is similarly inapposite and ignores the plain language of § 42-110g (a).

"When the applicable law of a foreign state *is not shown to be otherwise*, we presume it to be the same as our own." (Emphasis added.) *Walzer* v. *Walzer*, 173 Conn. 62, 76, 376 A.2d 414 (1977). "The threshold choice

of law issue in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between applicable laws of the states with a potential interest in the case. If not, there is no need to perform a choice of law analysis, and the law common to the jurisdiction should be applied." (Internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 320, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). In the present case, the defendants have failed to indicate in their appellate brief how the application of any other law would have conflicted with the provisions of CUTPA. Consequently, we determine that a choice of law analysis is inappropriate under these circumstances. See id.

The defendants also contend that the holdings of *Uniroyal Chemical Co.* and *Bailey Employment System, Inc.*, impose a higher standard that requires a plaintiff to prove that any ascertainable loss claimed under § 42-110g (a) must have been incurred within the state of Connecticut. We are not persuaded by this interpretation. Neither of the courts' holdings in *Uniroyal Chemical Co.* or *Bailey Employment System, Inc.*, mandates that a plaintiff prove that the economic impact of an ascertainable loss under CUTPA be experienced in Connecticut. See *Bailey Employment System, Inc.* v. *Hahn*, supra, 655 F.2d 476 (applying doctrine of lex loci delecti to determine legitimate issue regarding conflict of laws between states); *Uniroyal Chemical Co.* v. *Drexel Chemical Co.*, supra, 931 F. Sup. 140 (providing alternative ground to bring CUTPA claim when violation did not occur in Connecticut). Moreover, the plain language of § 42-110g (a), coupled with the broad and remedial application of CUTPA, belies such an interpretation and "provides *one limitation* by requiring that the plaintiff suffer an ascertainable loss that was caused by the alleged unfair trade practice." (Emphasis added; internal quotation marks omitted.) *Calandro* v. *Allstate Ins.*

*Co.*, 63 Conn. App. 602, 612, 778 A.2d 212 (2001). The defendants have not pointed us to any authority that interprets the language of § 42-110g (a) in such a manner that would support their position. As a result, the court concluded correctly that CUTPA was applicable in the present case because there was no dispute that the plaintiffs alleged an injury caused by unfair trade practices committed by the defendants *in the state of Connecticut.* See General Statutes § 42-110a (4) (actions violating CUTPA include *"the offering for sale . . .* or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state"* [emphasis added]). Accordingly, the defendants' argument is without merit.

### B

We next address the defendants' claim that the court improperly found Morris individually liable under the provisions of CUTPA. Specifically they claim that because his conduct was committed in his capacity as an officer or principal of Roll-A-Cover, LLC, he is immune on that ground pursuant to the protections afforded to him under General Statutes § 34-133 (a).[25] We do not agree.

"Because the issue of whether a corporate officer has committed or participated in the wrongful conduct of a corporation is a question of fact, it is subject to the clearly erroneous standard of review. . . . [A reviewing court] cannot retry the facts or pass upon the credibility of the witnesses. . . . A finding of fact

---

[25] General Statutes § 34-133 (a) provides in relevant part: "[A] person who is a member or manager of a limited liability company is not liable, solely by reason of being a member or manager, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company."

is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 142, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006).

"It is well established that an officer of a corporation does not incur personal liability for its torts merely because of his official position. Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby. . . . Thus, a director or officer who commits the tort or who directs the tortious act done, or participates or operates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort." (Internal quotation marks omitted.) *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 132–33, 2 A.3d 859 (2010). "It is black letter law that an officer of a corporation who commits a tort is personally liable to the victim regardless of whether the corporation itself is liable." *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 331–32, 593 A.2d 478 (1991). Additionally, the imposition of individual tort liability does not require the piercing of the corporate veil when there is ample evidence in the record that a defendant has personally committed a tort. See *Sturm* v. *Harb Development, LLC*, supra, 133; see also *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 141–42.

Here, the court found that Roll-A-Cover, LLC, *and* Morris made fraudulent misrepresentations to the plaintiffs. To support the court's finding that Morris violated CUTPA, we need not look any further than Morris' misrepresentations to the plaintiffs regarding the sale of

distributorships or his misrepresentations that it was imperative for the plaintiffs to secure the New Jersey territory because there were "other interested parties" that were pursuing the purchase of the distributorship rights to that area. See part I of this opinion. The defendants rely erroneously on § 34-133 (a) to contend that the court improperly found Morris personally liable under CUTPA because he was acting in his capacity as an officer of Roll-A-Cover, LLC. Our Supreme Court has affirmed the imposition of individual tort liability, without requiring the piercing of the corporate veil to hold a corporate officer "personally liable for *tortious* conduct in which the officer *directly* participated, regardless of whether the statutory basis for the claim expressly allows liability to be imposed on corporate officers." (Emphasis in original.) *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 145; see also *Sturm* v. *Harb Development, LLC*, supra, 298 Conn. 133. CUTPA provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." General Statutes § 42-110g (a). It is not the employment relationship that was dispositive in establishing Morris' personal liability under CUTPA; it was his conduct. See *Fink* v. *Golenbock*, 238 Conn. 183, 214, 680 A.2d 1243 (1996); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995). Here, the court found that Morris personally engaged in tortious conduct directed at the plaintiffs. Accordingly, we conclude that the court's finding that Morris was personally liable for his conduct under CUTPA was not clearly erroneous.

## IV

## AWARD OF DAMAGES

Last, the defendants claim that the court improperly awarded $75,000 in compensatory damages pursuant

to § 36b-74 (a).[26] Specifically, they claim that the court's award violated the statute's prohibition against unjust enrichment when the court failed to consider any profits or moneys that the plaintiffs may have received in relation to the New Jersey distributorship. We are not persuaded and conclude that the defendants' claim is moot.

We begin by setting forth our standard of review of a trial court's assessment of damages. "[A] trial court is vested with broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed . . . absent a clear abuse of discretion." (Internal quotation marks omitted.) *Saunders* v. *Firtel*, 293 Conn. 515, 528, 978 A.2d 487 (2009).

In its memorandum of decision on damages filed June 23, 2010, the court found "that the $75,000 paid by the plaintiffs for the distributorship represents a fair and appropriate basis for compensatory damages under the [business opportunity act], as well as *for all of the claims on which the plaintiffs prevailed.*"[27] (Emphasis added.) These independent findings regarding the compensatory damages for the remaining claims, which the plaintiffs have not challenged, must stand. See *Green* v. *Yankee Gas Corp.*, 120 Conn. App. 804, 805, 993 A.2d 982 (2010) (independent, unchallenged findings of court must stand). Even if we were to assume, without deciding, that the court's assessment of the compensatory

---

[26] General Statutes § 36b-74 (a) provides in relevant part: "If a business opportunity seller uses any untrue or misleading statement in the sale of a business opportunity, or fails to give the proper disclosures in the manner required by section 36b-63 . . . the purchaser-investor may void the contract and shall be entitled to receive from such business opportunity seller all sums paid to such business opportunity seller. . . . Purchaser-investors shall not be entitled to unjust enrichment by exercising the remedies provided in this subsection."

[27] As stated previously, the plaintiffs prevailed on all counts alleged in their first amended complaint. Those claims included fraud, fraudulent inducement, intentional and negligent misrepresentation, as well as violations found under CUTPA and the business opportunity act.

damages under § 36b-74 (a) did not properly consider the possibility that the plaintiffs were unjustly enriched, it would not detract from the court's broad discretion to award compensatory damages pursuant to the other claims on which the plaintiffs prevailed, including fraud, negligent misrepresentation and CUTPA. As a result, "[w]here alternative grounds found by the reviewing court and unchallenged on appeal would support the trial court's judgment, independent of some challenged ground, the challenged ground that forms the basis of the appeal is moot because the court on appeal could grant no practical relief to the complainant." (Internal quotation marks omitted.) *Horenian* v. *Washington*, 128 Conn. App. 91, 99, 15 A.3d 1194 (2011). Accordingly, because the defendants have not challenged the compensatory damages pursuant to the other violations found by the court, there is no practical relief available to them and, therefore, their claim is moot.[28]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[28] Cohen's appellate brief claims that the court erred in its assessment of damages. He has failed, however, to file a cross appeal. We decline to consider this claim because of Cohen's failure to the follow the appropriate procedural rules pursuant to our rules of practice. See Practice Book § 61-8; *Housing Authority* v. *Charter Oak Terrace/Rice Heights Health Center, Inc.*, 82 Conn. App. 18, 19 n.1, 842 A.2d 601 (2004).