ARNOLD SURESKY v. JOSEPH SWEEDLER ET AL.
(AC 33065)

Alvord, Espinosa and Flynn, Js.

Argued October 23, 2012—officially released February 19, 2013

*Barbara M. Schellenberg*, with whom, on the brief, were *David A. Ball* and *Jeffrey C. Dannenberg*, for the appellant (plaintiff).

*Anthony J. Diana,* pro hac vice, with whom was *John G. Stretton,* for the appellees (defendants).

FLYNN, J. The plaintiff, Arnold Suresky, appeals from the judgment of the trial court, rendered after a court trial, in favor of the defendants, Joseph Sweedler, William Sweedler, Andrew R. Tarshis, Windsong Allegiance Group, LLC (Windsong), Allegiance Apparel Group, LLC (Allegiance) and Joe Boxer Canada, LP (Joe Boxer), in his action seeking, inter alia, money damages, in which he alleged fraudulent inducement, breach of fiduciary duty, unjust enrichment, breach of contract and conversion.[1] On appeal, the plaintiff claims that the court erroneously found that he was not entitled to more than he received under exhibit 105 (the letter),[2] that the letter was a valid agreement supported by independent consideration, that the letter was not procured by fraud and that the plaintiff was not treated differently from other shareholders.[3] Because the plaintiff failed to prove a necessary predicate to his claims, namely, proof that what he received was less than that to which he was entitled, he cannot prevail on any other claim raised on appeal. Accordingly, we affirm the judgment of the trial court.

The following undisputed facts and procedural history inform our review. The plaintiff and Joseph Sweedler had a close friendship since the mid-1980s.

---

[1] On September 20, 2007, the trial court granted the defendants' motion to strike with respect to the plaintiff's conversion count. The plaintiff did not replead.

[2] Exhibit 105 (the letter) is a July, 2005 letter signed by the plaintiff agreeing to terms for the purchase of his interests in Windsong and Allegiance.

[3] In the plaintiff's "Statement of Issue" he set forth the following issue: "Did the [t]rial [c]ourt improperly conclude that [the letter] signed by [the] [p]laintiff was a valid agreement precluding him from pursuing his claims against [the] [d]efendants?" Nonetheless, the plaintiff has set forth the four issues as delineated above in the body of his brief.

The plaintiff asked Joseph Sweedler if he knew of any investment opportunities. In March, 2001, after some discussion, the plaintiff invested $2,000,000 for 10 percent of the outstanding equity in Allegiance and 5 percent[4] of the outstanding common equity in Windsong, companies in which Joseph Sweedler also held interests.[5] In January, 2002, the plaintiff invested an additional $500,000 and received a 5 percent interest in Hathaway Holding Company, LLC (Hathaway).

The plaintiff was interested in receiving a money return periodically through these investments. In order to accommodate the plaintiff's desire to have a current return on his invested money, the plaintiff received a job and a title without an office, telephone or obligations outside of making himself available for consultations. The plaintiff also made two loans to Windsong, which were repaid in accordance with the agreement of the parties. At one point, the plaintiff became concerned because he was not receiving cash distributions and his accountant, Stanley Morin, was not able to reconcile the capital account entries of Windsong, Allegiance and Joe Boxer. A meeting regarding these concerns subsequently was held and, as a result, the plaintiff received

---

[4] The Windsong limited liability company agreement lists the plaintiff as a 6.6666 percent owner. The plaintiff's ownership was commonly referred to as a 5 percent interest because Windsong owned 75 percent of the outstanding common equity in JBC Holdings, LLC, the Joe Boxer mark holding company, and nZania II, LLC, owned the remaining 25 percent, such that 75 percent of the plaintiff's 6.6666 percent actually is 5 percent.

[5] Joe Boxer was a limited partnership formed to use, sell and license the Joe Boxer mark in Canada. In May, 2001, the plaintiff acquired a 4.975 percent interest in Joe Boxer. Although William Sweedler, Joseph Sweedler, David Sweedler, Alan Rummelsburg and the plaintiff owned a combined 51.411 percent and Windsong owned 48.092 percent of Joe Boxer, Windsong was considered the parent company of Joe Boxer. Tarshis testified that Joe Boxer had been structured in this way because "when a licensing [company] in Canada pays royalties it's required in Canada to withhold, I believe 20 percent of those royalties. And we were advised that this structure would enable the company to realize a greater benefit."

substantial distributions, a benefit which none of the other shareholders received.

In January, 2004, Windsong and Joe Boxer were involved in an exchange and separation agreement (swap agreement), which augmented the plaintiff's interest in Windsong and Joe Boxer to 10 percent each.[6] Under the agreement, Windsong became the 100 percent owner of JBC Holdings, LLC, while nZania II, LLC, Joseph Laurita and Christopher Laurita became 100 percent owners of Hathaway.

The plaintiff's lawsuit centers around the sale of the Joe Boxer mark to Iconix Brand Group, Inc. (Iconix), on July 22, 2005, for $40,000,000 in cash and 4,350,000 shares of Iconix stock, which were valued at that time at approximately $39,150,000. The dispute specifically concerns the letter signed by the plaintiff and William Sweedler.

The letter states in relevant part: "This will confirm our agreement with respect to the redemption of your entire membership interests in [Windsong] and [Allegiance] (the 'Companies') in consideration of the following payments (the 'Payments'):

"1. $1,402,357 in readily available funds—to be paid immediately; and

"2. 412,250 shares of restricted stock in [Iconix] to be issued within the next 30 days. . . .

"You agree that the Payments shall be in full and complete satisfaction of the your entire membership interests in the Companies and that you will have no

---

[6] The court, in its memorandum of decision, found that "[t]here is no dispute, however, that the plaintiff held a 5 percent interest at the time these businesses [were] eventually sold to Iconix Brand Group, Inc., for $40,000,000.00 in cash and shares of restricted stock." This finding is inaccurate, as the parties do not dispute that at the time of the Iconix deal the plaintiff held a 10 percent interest, which also is reflected in the record.

further interest in the Companies or any rights or privileges with respect to same and that there will be no amounts owed to you by the Companies of any kind. . . ."

The plaintiff claims that he was tricked into signing the letter under the guise that it was required for closing the Iconix deal, while, unbeknownst to the plaintiff, it was actually an agreement to redeem his interest in Windsong, Allegiance and Joe Boxer.[7] The defendants, however, allege that the plaintiff knowingly signed the letter after a discussion of its contents, such that the plaintiff was aware that he was redeeming his interests and approved of the payment.

On June 14, 2006, the plaintiff filed his original complaint against the defendants alleging fraudulent inducement, breach of fiduciary duties, unjust enrichment, breach of contract and conversion.[8] The defendants filed their answer, special defenses and counterclaim on November 5, 2007. The defendants answered all allegations contained in the plaintiff's amended complaint and responded to the allegations related to the plaintiff's conversion count by referencing the defendants' motion to strike with respect to that count, which was granted on September 20, 2007. The plaintiff chose not to replead that count and otherwise denied any allegations contained therein. The defendants also put forth sixteen special defenses, and Windsong filed a one count counterclaim for setoff or breach of contract, alleging that the plaintiff owed $130,000 in satisfaction of his pro rata share of Windsong's "claw back provision" under the Joe Boxer acquisition.[9]

---

[7] At trial, the plaintiff and the defendants presented very different accounts of the circumstances surrounding the signing of the letter.

[8] The defendants filed a request to revise the plaintiff's complaint on August 17, 2006. The plaintiff's amended complaint, dated December 6, 2006, was filed as served on April 26, 2010, and, although some language was amended, the plaintiff's five counts remained substantively the same.

[9] Under the "claw back provision" in Windsong's swap agreement, Windsong was obligated to pay 5 percent of the first $5 million received in excess

After a trial, beginning April 27, 2010, and spanning five days, the court, in its memorandum of decision and judgment dated December 21, 2010, found that the letter was "a valid agreement which on its face was not manifestly unfair to the plaintiff." Furthermore, the court found for the plaintiff on Windsong's counterclaim. The court found that "the defendants have failed to prove that the amounts claimed were encompassed within [the letter] because the claims also involved a subsequent agreement with other parties to which the plaintiff was not a party." This appeal by the plaintiff then followed.

On appeal, the plaintiff claims that the court erroneously found that he was not entitled to more than he received under the letter, that the letter was a valid agreement, that the letter was not procured by fraud and that the plaintiff was not treated differently from other shareholders. We first address whether the plaintiff was entitled to receive more than what he received under the letter. In order to logically reach the validity of the letter, it is necessary to first assess the court's findings of fact as to whether the plaintiff suffered an ascertainable loss and thus received less under the letter than that to which he otherwise was entitled.

We begin by setting forth our standard of review and the principles that guide our analysis. "[W]hen reviewing findings of fact, we defer to the trial court's determination unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when

---

of $25 million plus 10 percent of any amount received in excess of $30 million, capped at $4 million, back to Hathaway, in the event the Joe Boxer mark was sold by Windsong within two years of the swap agreement. After the letter was signed, Windsong was able to reach a settlement with Hathaway for a total amount of $1,300,000. The defendants sought for the plaintiff to pay 10 percent of the settlement in accordance with his 10 percent ownership interest and the letter.

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Under the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did." (Citations omitted; internal quotation marks omitted.) *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 829–30, 43 A.3d 607 (2012).

"The general burden of proof rests upon the plaintiff in civil actions. . . . The defendant's failure to present any evidence in contradiction of that offered by the plaintiff gives no support to the claim that the truth of all the essential allegations of the complaint was established. A plaintiff prevails not by reason of the weakness of the defendant's case but because of the strength of his own." (Citation omitted.) *Silva* v. *Hartford*, 141 Conn. 126, 128, 104 A.2d 210 (1954); see *Eichman* v. *J & J Building Co.*, 216 Conn. 443, 451, 582 A.2d 182 (1990). "The plaintiff in a civil case 'sustain[s] his burden of proof as to any essential element in his cause of action if the evidence, considered fairly and impartially, induce[s] in the mind of the trier a reasonable belief that it [is] more probable than otherwise that the facts involved in that element [are] true.' " *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 535 n.8, 733 A.2d 197 (1999).

The court in its memorandum of decision did not find that the plaintiff received less under the letter than what he otherwise would have been entitled to receive. In the court's discussion, it found that "it does not appear [that the] plaintiff was treated any differently than the other shareholders except for the deductions for the amount [of the] distributions the plaintiff received to the exclusion by the other stockholders."

The court ultimately concluded: "The manner in which [the letter] treats the plaintiff is no different from the manner in which all other shareholders were treated with the exception of the fact that the plaintiff's cash distribution was reduced because he had received distributions over the previous months which were not given to other shareholders. . . . [T]he issue is not whether the plaintiff made out well under the transaction. The issue is whether the plaintiff has proven that he was entitled to more. The court finds that [the letter] in which the plaintiff agreed to the sums he received and agreed that he had no further claims against the defendants was a valid agreement which on its face was not manifestly unfair to the plaintiff."

The plaintiff claims that the court's finding that he was not entitled to more than what he received was clearly erroneous. The defendants argue that the plaintiff failed to prove that he received less under the letter than he would have received without it because the plaintiff failed to provide expert testimony on this issue, instead relying on the fact testimony of his accountant, Stanley Morin. We agree with the defendants.

The record reveals testimony by Joseph Sweedler regarding the plaintiff's portion of the Iconix transaction. Joseph Sweedler testified that: "[A]t that point in time the [Iconix] deal was then consummated and he then got his [10] percent in the exact same proportion that we all got our percentages."

Joseph Sweedler further testified in opposition to the plaintiff's contention that he received less than he was entitled to under the letter. The following questions were posed by the plaintiff's counsel:

"Q. Did there come a time before the lawsuit started when you were made aware of the fact that [the plaintiff] thought that he had been underpaid that to which he thought he was entitled?

"A. Yes.

"Q. How soon after the Iconix closing did you first hear that?

"A. It was either one or two days—and I am not absolutely certain of the time. But it was either one or two days that [the plaintiff] came to my office early in the morning and started explaining to me that he felt that we had no right to deduct the distributions from his cash position when I had, in fact, discussed that with him on numerous occasions and he agreed with me. Yes, you should deduct the distributions from my cash portion. But either, as I said, a day or two later he came to my office. And I had an appointment at 9 o'clock. And he was really going after me and saying that he didn't get his fair share. And I said, Arnie, you got exactly what you were entitled to, if not more than anybody else, because not only did you have the use of the 1,100,000 in distributions that nobody else got, but you had the use of that money all that time. And he said well, you shouldn't have taken it away and you took too much and you're—oh."

Finally, Joseph Sweedler testified as to how the plaintiff's share was calculated and dispersed. The following exchange took place between the defendants' counsel and Joseph Sweedler:

"A. [Exhibit 108] is the wire transfer to Deutsche Bank. I'm assuming that's his bank. Yeah. To the beneficiary of Arnold Suresky of $1,402,357.

"Q. What did that amount of money represent?

"A. That represented the—the—his total cash distribution. If you go back to [exhibit 106 or exhibit 107], he was entitled to [2.5]—he was entitled to [10] percent of the twenty-five million some odd dollars that we received in cash, of which that twenty—he was—he was respons—well, he was entitled to $2.5 million of

that money. He had already gotten 1.1 million in distributions, which nobody else had gotten. So we deducted that [1.1] from the [2.5] to give you a difference of one million four hundred and some odd thousand dollars in cash that he got right then and there."

The record also contains testimony by William Sweedler regarding the plaintiff's portion of the Iconix transaction. The following colloquy took place between the plaintiff's counsel and William Sweedler:

"Q. Now, you testified in some detail, actually, and you kept going back to it, the fact that having gone through a few different permutations of potential buyouts over a period of months before the Iconix closing, [the plaintiff] finally came around to what you were recommending he do, which was take the Iconix deal, whatever you're entitled to, as a [10] percent interestholder; yes?

"A. Less his . . . .

"Q. Less his—less that $1.3 million; yes?

"A. Yes.

"Q. Now, so other than the $1.3 million, he was getting pro rata what everybody else got; yes?

"A. He was getting [10] percent of the net proceeds, less his distributions.

"Q. Right. Ten percent of the cash, with all the discounts that you had on the pro rata for everybody—

"A. Not discounts; expenses.

"Q. And less percent—and [10] percent of the stock, less whatever discounts or deductions you made?

"A. The expenses.

"Q. And other than [1.3] $1.13 million, the deductions or the expenses that you knocked off in order to calculate the net amount of the proceeds, in order to take percentages, was the same for everybody; yes?

\* \* \*

"Q. You were doing those pro rata sheets for everyone, were you not? That's what you said?

"A. Yes.

"Q. Okay. So everybody showed the same amount of expenses being taken off on the cash side or deductions, and on the stock side, if we're going to get to net figures from which their respective percentages would be used to calculate their share; correct?

"A. Yes, except there were additional expenses that were incurred by the company, so in fact probably lot a little bit less."

Furthermore, the record contains exhibits 106 and 107. Exhibit 106 is a document describing how the payments, listed in the letter, were calculated. The Iconix deal yielded a gross of $40,000,000 cash and 4,350,000 shares of stock. After deductions were made from both the cash and stock, $25,323,570 and 4,122,500 shares were remaining. Exhibit 106 then allots the plaintiff 10 percent of both net amounts, $2,532,357 and 412,250 shares, respectively. The plaintiff's 10 percent cash share was further reduced by $1,130,000, the distributions paid out to the plaintiff prior to the Iconix deal, which yielded $1,402,357 in cash to be paid to the plaintiff. Therefore, the payments as reflected in the letter, $1,402,357 in cash and 412,250 shares, match the plaintiff's pro rata share as calculated in exhibit 106.

Exhibit 107, another document calculating the plaintiff's share of the cash and stock payouts from Iconix, contains additional notations that show that the cash

paid to the plaintiff, plus the cash value of the stock paid to the plaintiff, plus the distributions he received prior to the Iconix deal totaled $6,531,182. The exhibit also illustrates that $6,531,182 was 10 percent of the net value of the Iconix transaction, $65,311,820.

The plaintiff further argues that he got less under the letter than what he was entitled to under the Windsong and Allegiance agreements because of errors in the upkeep of the capital accounts. With respect to the capital accounts, the court found the following: "There was considerable testimony that the plaintiff's investments could not be equated with the capital account as set forth in the records of the various companies. The plaintiff's accountant testified that he could not determine the appropriateness of the capital accounts. However, there was no expert testimony presented with respect to the capital account entries on the companies' records or the effect of the inability of the plaintiff's accountant to equate the entries with the investments of the plaintiff. Thus, there was no expert testimony presented by either side as to the effect of those discrepancies [or] how it affected the other shareholders or the relationship between the shareholders.

* * *

"While the plaintiff has produced evidence as to the manner in which his investments were accounted for in the capital accounts, there was no expert evidence on that issue. In addition, there was no evidence that the other shareholders benefited because of the capital account entries."

"As a rule, expert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." (Internal quotation marks omitted.) *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 301, 589 A.2d 337 (1991). "Expert testimony is required

only when a disputed matter is manifestly beyond the ken of the average trier of fact, be it judge or jury." (Internal quotation marks omitted.) *Michalski* v. *Hinz*, 100 Conn. App. 389, 404, 918 A.2d 964 (2007).

The plaintiff filed his disclosure of expert witness, dated October 23, 2009, on December 2, 2009, for Jeffrey T. Harfenist, CPA. Harfenist was "expected to offer expert testimony in the field of tax and accounting analysis, relating in particular to the capital activity for plaintiff's membership interests in [Windsong] and related companies (collectively, the 'Companies'). . . . The expert opinion upon which the witness is expected to testify is that the redemption of [the] plaintiff's interest in the Companies, based upon an analysis of his capital account following his realization of proceeds from the sale of certain assets of the Companies to, and the assumption of certain liabilities of the Companies by, [Iconix], should have been in an amount no less than $4,173,631." On December 2, 2009, the plaintiff also filed a supplemental disclosure of expert witness for Harfenist, dated October 30, 2009, changing the amount to $4,573,631. The plaintiff's second supplemental disclosure of expert witness, filed on December 23, 2009, again amended the amount that the plaintiff claimed he should have received, reducing the amount claimed to "no less than $3,137,725."[10]

The defendants filed their disclosure of expert witness on January 8, 2010, for Craig P. Casey, CPA, stating, in relevant part: "The field of expertise and the subject matter on which Mr. Casey is expected to offer expert testimony, the expert opinions to which Mr. Casey is expected to testify, and the substance of the grounds for each such expert opinion are set forth in a written

[10] We note that this amount, $3,137,725, is less than the amount that the plaintiff undisputedly received under the letter, $5,401,182, namely, $1,402,357 in cash and 412,250 shares of stock with a value at the time of transfer of approximately $3,998,825.

report prepared by Mr. Casey and those working under his supervision . . . ." Casey's written report focused on evaluating Harfenist's report.

At trial, however, the plaintiff never called Harfenist to testify. Consequently, the defendants did not call Casey to testify because there was no expert testimony presented for Casey to rebut. Neither side, therefore, produced *any* expert testimony at trial. It was the plaintiff's burden to offer such expert testimony, and the plaintiff failed to meet that burden. See *Silva* v. *Hartford*, supra, 141 Conn. 128.

On the basis of the testimony and exhibits, as set forth in this opinion, we conclude that the court's determination that the plaintiff did not receive less than he was entitled to receive is not clearly erroneous. The plaintiff was a 10 percent holder of Windsong and Allegiance, and, as such, received his pro rata 10 percent share of the Iconix deal, the same as the other members. There is evidence in the record from which the court reasonably could have found that the plaintiff was not entitled to receive more than what he received either under the letter or otherwise. See *418 Meadow Sreet Associates, LLC* v. *Clean Air Partners, LLC*, supra, 304 Conn. 829–30. Regardless of the letter, the plaintiff failed to show that he received less than what he was entitled to receive.

Additionally, we conclude that the plaintiff has not shown any clear error by the court in determining that expert testimony was necessary to show any discrepancies in the capital accounts that might prove that the plaintiff received less under the letter than he otherwise was entitled to receive. Specifically, this case involves the capital accounts of three separate companies over a span of five years.[11] The evidence in this case includes

[11] Windsong's tax return lists seven partners, Allegiance's tax return lists nine partners and Joe Boxer's tax return lists ten partners, each with their own individual capital account.

five years of individual income tax returns for the plaintiff, five years of tax returns for the three companies, as well as payroll records, the plaintiff's promissory notes and repayment records. Navigating these documents, deciphering the accounting of these entities and essentially performing forensic accounting of the capital accounts undoubtedly goes beyond the field of ordinary knowledge and experience of judges acting as fact finders. See *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, supra, 218 Conn. 301. On the basis of the evidence presented, therefore, without some expert assistance, it would be unreasonable to expect the court to analyze and then conclude that there were discrepancies in the capital accounts and the possible effect of those purported discrepancies on the plaintiff and other shareholders.

The letter sets forth an amount to be paid to the plaintiff for his interest in the companies. Under all of the plaintiff's surviving counts, namely, fraudulent inducement, breach of fiduciary duty, unjust enrichment and breach of contract, it was the plaintiff's burden to prove his case and his injury. In other words, the plaintiff had to prove that he received less than he otherwise was entitled to receive. However, after a careful review of the record, we find it devoid of any evidence as to the dollar amount to which the plaintiff claimed entitlement, nor do we find any reasonable estimate of his claimed damages.

Because the plaintiff has not shown that the court's determination that he received that to which he was entitled was clearly erroneous, the plaintiff has failed to prove any underlying injury and, as such, he cannot prevail on any other claim raised on appeal.

The judgment is affirmed.

In this opinion the other judges concurred.