JOSEPH GENERAL CONTRACTING, INC. *v.*
JOHN COUTO ET AL.
(AC 34100)

JOHN COUTO ET AL. *v.* LANDEL REALTY, LLC, ET AL.
(AC 34102)

Gruendel, Sheldon and Peters, Js.

Argued February 14—officially released July 23, 2013

*Patrick J. Day*, with whom was *Thomas J. Londregan*, for the appellants (plaintiff in AC 34100 and defendants in AC 34102).

*John C. Zaccaro, Jr.*, for the appellees (defendants in AC 34100 and plaintiffs in AC 34102).

*Opinion*

PETERS, J. These appeals arise out of consolidated actions in which the trial court rendered judgments holding a builder personally liable for breach of a construction contract and tortious conduct. The dispositive issue is whether the homeowners proved that the builder, in his individual capacity, had incurred contractual obligations to them and was personally liable for the damages that they sustained as a result of the builder's nonperformance. We affirm the judgments of the trial court.

On June 27, 2007, the plaintiff in AC 34100, Joseph General Contracting, Inc. (Joseph General), filed two separate complaints against the defendants in AC 34100, John Couto and Jane Couto.[1] The first action contained five counts and raised claims of breach of contract,[2]

---

[1] Because there are multiple parties in this appeal who are both plaintiffs and defendants, we refer to the parties by their names for the sake of clarity.

[2] Specifically, Joseph General's complaint alleged breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing and asserted promissory estoppel against the Coutos.

and the second action sought to foreclose a mechanic's lien held by Joseph General on the Coutos' property.[3] The Coutos denied their liability and asserted various special defenses, including allegations that the owner and president of Joseph General, Anthony J. Silvestri, personally had induced them to enter into a contract through material misrepresentations, that its claims were barred by its own breach of contract and warranty, and that Joseph General had been fully paid for the work it completed in accordance with the contractual agreement.

The Coutos also filed a six count counterclaim against Joseph General, alleging violation of General Statutes § 47-200 et seq., the Common Interest Ownership Act, breach of contract, fraud, breach of implied warranty, trespass and violation of General Statutes § 42-110b et seq., the Connecticut Unfair Trade Practices Act (CUTPA). Subsequently, the Coutos, in AC 34102, commenced a separate action on February 6, 2009, against Silvestri, the sole owner and shareholder of Joseph General, and Landel Realty, LLC (Landel), of which Silvestri is also the sole owner. That action incorporated the allegations of the Coutos' counterclaim, in addition to alleging intentional infliction of emotional distress and seeking declaratory relief pursuant to the Common Interest Ownership Act.[4] A consolidated trial[5] of the

[3] The Coutos subsequently substituted a bond held by Travelers Casualty and Surety Company of America (Travelers) in lieu of the mechanic's lien, and the two actions were then consolidated. The court granted Joseph General leave to amend its complaint to include a fifth count against Travelers. Travelers, however, is not a party to the present appeal. Further, the defendant Stock Building, Inc., was named as a defendant subsequent encumbrancer in the mechanic's lien action but was a nonappearing party at trial and is not a party to the present appeals.

[4] The Coutos filed a second amended complaint on February 4, 2010.

[5] The court previously had granted the Coutos' motion to consolidate two additional actions concerning the construction site on October 2, 2009, which were also considered during the court trial but are not relevant to these appeals.

pending actions filed against the Coutos, Joseph General, Landel and Silvestri was held before the court on May 17 to 31, 2011.

After trial, the court rendered judgment in favor of Joseph General, Landel, and Silvestri as to the Coutos' claims of fraud, violation of the Common Interest Ownership Act and intentional infliction of emotional distress.[6] The court rendered judgment in favor of the Coutos as to all other counts, holding Joseph General, Landel and Silvestri each jointly and severally liable for breach of contract and implied warranty, trespass and violation of CUTPA, awarding a total of approximately $573,659 in damages.[7] On appeal, Silvestri challenges the propriety of these adverse rulings with respect to his personal liability.[8]

In view of the evidence presented in the consolidated trial of these actions, the court reasonably could have found the following facts. In 2006, the Coutos entered into a written contract with Joseph General for the purchase and construction of a home and carriage house to be built on a piece of property in the Admiral Cove subdivision in Stonington (lot 5), for the price of $1,980,000. The carriage house was intended for use

---

[6] The count for declaratory relief concerning the rights enjoyed by lots 1 and 5 of the Admiral Cove subdivision in Stonington was dismissed for lack of jurisdiction and for failure to add the necessary parties.

[7] During trial, the court delivered a partial judgment from the bench on May 31, 2011, in which it rendered the judgments described previously, but reserved judgment on the issue of Silvestri's personal liability for breach of contract, requesting supplemental briefing by both parties on that issue. The parties failed to submit posttrial briefs, and in an October 26, 2011, written memorandum of decision, the court held Silvestri personally liable, in addition to Joseph General and Landel, for breaching his contractual obligations to the Coutos.

[8] Although Joseph General and Landel are referred to as appellants in these appeals, only Silvestri challenges the court's judgment, and does so solely in his capacity as an individual. The Coutos have not appealed from the denial of their claims for intentional infliction of emotional distress or declaratory relief.

as a separate dwelling for the Coutos' special needs daughter, a purpose of which Silvestri was aware. At the time the contract was signed, Silvestri assured the Coutos that if they did not like the home and the carriage house, they would not be obligated to buy lot 5 or the completed dwellings. Although the contract terms were vague, they specified that the new home was to be of like kind and quality, and built with the same materials as used in a model home also located in Admiral Cove, which previously had been constructed by Joseph General, Landel and Silvestri, collectively. The architect who designed the model house was also to design the two dwellings on lot 5 for the Coutos. Silvestri knew, however, that the zoning requirements regulating Admiral Cove contained a single-family dwelling restriction applicable to each of the lots in the development.[9] At the time they signed the contract, the Coutos were unaware of this zoning restriction.

Although the original contract for the development of the new home and carriage house was executed between the Coutos and Joseph General, the parties also proceeded to negotiate additional oral agreements to supplement its terms.[10] These subsequent modifications essentially replaced the prior written contract, and were negotiated individually with Silvestri. The trial court apparently found credible the testimony of the Coutos that, throughout the continued construction process, they were confused as to whom they were

---

[9] The evidence in the record demonstrates that Silvestri believed he could build the two dwellings despite this zoning restriction by not installing a stove in the secondary dwelling to be built on lot 5. He did not, however, inform the Coutos that building the carriage house could present a zoning issue. The Coutos' later application for a variance was denied.

[10] After oral argument in this court, counsel for Silvestri represented, for the first time, that the written construction contract contained a merger clause, an issue on which questions had been raised at oral argument. In light of a timely objection by counsel for the Coutos, we decline to consider this additional information in our review of the present appeals.

dealing with. The Coutos also entered into a written agreement to deliver funds to escrow in payment for a security card system, docking installation, docking permits and estate paving, as well as a second written contract relating to a construction loan obtained by the Coutos. Both of these agreements were signed by Silvestri, individually, and on behalf of Landel. In light of this evidence presented at trial, the trial court determined that a contract existed not only between Joseph General and the Coutos, but also between the Coutos, Landel and Silvestri.

The evidence at trial showed that, as the construction process continued, Silvestri had financial difficulties in performing his obligations. The Chelsea Groton Savings Bank declined to provide financing because the bank did not believe that extending further funds to Silvestri was prudent. Silvestri represented to the Coutos that the reason for the bank's refusal to finance the project was that the Coutos were reserving their right to decline to buy the property until after the two buildings had been constructed. He misinformed the Coutos that, regardless of the express terms of their contract, they were likely to lose their deposits under the contract if they did not pay for the construction upfront. So threatened, the Coutos acquiesced and agreed to purchase lot 5 from Landel, giving up their contractual right to reject the construction development in its entirety if it was not completed to their satisfaction. The Coutos paid a total of $880,000 to purchase lot 5 from Landel and to have Silvestri and Joseph General complete the construction of their new home and carriage house. The Coutos also obtained a construction loan from the Chelsea Groton Savings Bank to help finance the construction. A new agreement incorporating these modifications was drafted by the Coutos and Joseph General, but was never signed by either party.

After the Coutos' payment of the purchase price for lot 5 and the construction of the two contemplated dwellings, work pursuant to the contract began, but not without further setbacks. First, Silvestri informed the Coutos that the agreed upon architect was no longer available, and that he would have to substitute a different designer. The first design of the primary dwelling produced by the substitute architect was larger than the design previously agreed to, and Silvestri instructed him to reduce its size. As construction of the house progressed, however, it became clear that many of the rooms in the house would not be functional because necessary appliances such as toilets and sinks did not fit within the shrinking size of the house. The Coutos also had difficulty purchasing fixtures for the dwellings within the allowances set forth in the contract.

At this point, Silvestri, Joseph General and Landel had been compensated fully for their work performed to date. Nonetheless, Silvestri demanded another large progress payment, which, as the trial court found, the Coutos reasonably refused to pay until the issue with the allowances for fixtures had been resolved. After their refusal to remit another payment, Silvestri ceased construction of the dwellings and obtained a mechanic's lien on lot 5. In addition, he covered and thereby prevented the Coutos from accessing the sewer line on their property.

Forced to complete the construction of their home through a new, substitute contractor, the Coutos discovered numerous other problems with poor workmanship, as well as a large quantity of debris that had been buried under, and caused damage to, the portion of lot 5 designated for the construction of the carriage house. The new contractor also informed the Coutos about the single-family dwelling zoning restriction on the property. At that point, they applied for a zoning vari-

ance to allow construction to continue on the carriage house, but their application was denied.

On appeal, Silvestri challenges the propriety of the trial court's adverse factual findings. He maintains that these findings were clearly erroneous because (1) the evidence presented was insufficient to hold him personally liable for breach of contract and breach of implied warranty, (2) the court improperly found him individually liable for trespass without expressly finding that he personally had buried debris on the Coutos' property and (3) the evidence did not support a finding that his behavior amounted to a personal violation of CUTPA. We are not persuaded.

We begin by setting forth the applicable standard of review. "In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Citation omitted; internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 462, 844 A.2d 836 (2004). "[F]actual findings of a trial court . . . are reversible only if they are clearly erroneous. . . . This court cannot retry the facts or pass upon the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Internal quotation marks omitted.) *Giulietti*

v. *Giulietti*, 65 Conn. App. 813, 837, 784 A.2d 905, cert. denied, 258 Conn. 946–47, 788 A.2d 95, 96, 97 (2001).

I

Silvestri first claims that, because he was acting at all times as an authorized corporate officer of one of his two limited liability corporations, the court improperly imposed personal liability on him for breach of contract and breach of implied warranty. Silvestri further contends that because the trial court found in his favor as to the Coutos' allegation of fraud, the Coutos were not entitled to pierce the corporate veil to hold him personally liable under the construction contract. We are not persuaded.

A

Contrary to Silvestri's claim that the court improperly pierced the corporate veil in order to hold him liable for breach of contract, the trial court expressly found it unnecessary to make such a determination. It relied instead on its finding that Silvestri had been a party to the agreement in his individual capacity and, therefore, had assumed personal responsibility for its performance. "It is well settled that the existence of a contract is a question of fact"; (Internal quotation marks omitted.) *Stevenson Lumber Co.-Suffield, Inc.* v. *Chase Associates, Inc.*, 284 Conn. 205, 216, 932 A.2d 401 (2007); and we therefore review the court's finding for clear error.

Silvestri contends that, in all his dealings with the Coutos, he consistently acted in his capacity as a corporate officer and, therefore, pursuant to General Statutes § 34-133 (a),[11] is not individually liable for his corporations' contracts. "[T]he language of § 34-133 (a) itself

---

[11] General Statutes § 34-133 (a) provides: "Except as provided in subsection (b) of this section, a person who is a member or manager of a limited liability company is not liable, solely by reason of being a member or manager, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether

is favorable to common-law exceptions. According to that statute, a member or manager of a limited liability company is not liable, *solely* by reason of being a member or manager . . . . [A]lthough being a member or manager does not impose liability, the statute's use of the term solely opens the door to other types of liability, such as common-law liability. . . . Thus, the statute plainly provides that a limited liability company member cannot be held liable for the malfeasance of a limited liability company by virtue of his membership in the limited liability company alone; in other words, he must do more than merely be a member in order to be liable personally for an obligation of the limited liability company. The statute thus *does not* preclude individual liability for members of a limited liability company if that liability is not based simply on the member's affiliation with the company." (Citation omitted; emphasis added; internal quotation marks omitted.) *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 136–37, 2 A.3d 859 (2010).

Although the trial court found Joseph General, Landel, and Silvestri jointly and severally liable for breaching their contractual obligations to the Coutos, the court had the authority, in light of the facts of record, to impose personal liability on Silvestri for reasons other than his membership in each of those corporations. Significantly, the court expressly found that "while the initial contract may well have been between the Coutos and Joseph General, subsequent developments without any signed agreements make it clear that, because of the individual failure to obtain financing on the part of Mr. Silvestri, the individual importuning by Mr. Silvestri, and the individual tortious conduct of Mr. Silvestri . . . the actions of the parties can only be

arising in contract, tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company."

construed as joint action by Mr. Silvestri, Joseph General and Landel, and therefore the court finds against those three parties on [the breach of contract] counts."

The evidence of record supports the trial court's findings. From the beginning of the contract negotiations, Silvestri was aware of the specific purpose for which the Coutos needed a carriage house on their property and represented to them that he could build such a separate dwelling. He did not inform the Coutos that adverse zoning regulations might impair his ability to construct the carriage house in accordance with the contract specifications.[12]

Although the Coutos originally understood that their contract for construction was with Joseph General rather than with Silvestri individually, over time, Silvestri's conduct muddied the waters so that, over the course of performance, it became unclear to them with whom they were transacting business. Silvestri, in his personal capacity, pressured the Coutos to change the nature of the contract by paying for the development up front. Silvestri individually signed an escrow agreement with the Coutos for the purpose of estate paving, and obtained a permit for the dock at Admiral Cove in his own name. After Silvestri failed to obtain bank financing, requiring the Coutos to obtain a construction loan, they entered into yet another contract with Silvestri, individually, about the terms for payment of interest on the loan. Throughout these modifications of the original contract, Silvestri personally initiated the modifications in the contractual relationship between the parties. In light of these facts of record, the court found that the Coutos reasonably were entitled to infer from Silvestri's

[12] Peter Giordano, the residential home builder hired by the Coutos to continue the development on lot 5 after Silvestri ceased construction, testified that he informed the Coutos that the carriage house could not be a legal second dwelling. He further testified that Mrs. Couto was surprised and upset upon learning of the zoning restriction on the property.

conduct that he personally had become a party to the contract for the construction of their main house and carriage house.

Silvestri claims that the Coutos, nonetheless, should have recognized that he was always acting as an agent, and therefore for the benefit of Joseph General or Landel. In his view, because the Coutos were on notice of the *existence* of both of his two businesses, they could look only to these entities as the parties responsible for breach of contract.

"To avoid personal liability, it is the duty of an agent to disclose both the fact that he is acting in a representative capacity and the identity of his principal, since the party with whom he deals is not required to discover or to make inquiries to discover these facts." *New England Whalers Hockey Club* v. *Nair*, 1 Conn. App. 680, 683, 474 A.2d 810 (1984). "The law is settled that where an agent contracts in his own name, without disclosing his representative capacity, the agent is personally liable on the contract." *Murphy* v. *Dell Corp.*, 184 Conn. 581, 582, 440 A.2d 223 (1981).

The court reasonably found that it was unclear to the Coutos which party was responsible for each term of the modified contract. Although Silvestri attempts to shift the burden of disproving an agency relationship to the Coutos, the burden to prove such a relationship lies on the party claiming the benefit of the relationship. See *New England Whalers Hockey Club* v. *Nair*, supra, 1 Conn. App. 683. The fact that the Coutos were aware of the existence of Landel and Joseph General does not satisfy this burden. Although, at the outset, Silvestri disclosed the identity of his principals, it was reasonable for the court to find that, thereafter, he did not clearly inform the Coutos that he continued, at all times, to be acting in a representative rather than in an individual capacity. In light of that finding, it was not clear

error for the court to find that Silvestri was a party to the modified contract and hence personally liable for breach of contract.

B

Silvestri also challenges the propriety of the court's finding that he is personally liable for breach of implied warranty. In his brief, however, he has failed to provide any analysis in support of his challenge to the court's finding that he is individually liable for breach of implied warranty. "[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123 Conn. App. 402, 406, 1 A.3d 1238, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010). Silvestri's claim that he is not personally liable for breach of warranty, therefore, merits no further consideration.

II

Silvestri next claims that the court improperly held him personally liable for tortiously causing debris to be buried on lot 5, which was owned by the Coutos. Silvestri does not contend that his two companies,

Joseph General and Landel, were improperly held liable for trespass. Rather, he again claims that he was at all times acting solely as an agent of his two corporations. Because, concededly, Silvestri did not personally bury the debris, he maintains that he cannot be held personally liable for the damage it caused to the Coutos' property. We disagree.

"Because the issue of whether a corporate officer has committed or participated in the wrongful conduct of a corporation is a question of fact, it is subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Cohen* v. *Roll-A-Cover, LLC*, 131 Conn. App. 443, 467–68, 27 A.3d 1, cert. denied, 303 Conn. 915, 33 A.3d 739 (2011).

In light of the court's finding that the contractual relationship between Silvestri and the Coutos had changed over time, it was reasonable for the court to find that, because of Silvestri's conduct, it became unclear to the Coutos with whom they were dealing in regard to the various elements of the construction agreement. This uncertainty also supports the court's finding in favor of the Coutos on this issue. Further, "[i]t is black letter law that an officer of a corporation who commits a tort is personally liable to the victim regardless of whether the corporation itself is liable." *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 331–32, 593 A.2d 478 (1991). Having found that Silvestri caused the debris to be placed on the Coutos' property, the court specifically and properly held him personally responsible for his own tort, not the tortious conduct of his businesses.

"[A]n officer of a corporation does not incur personal liability for its torts merely because of his official position. Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby." *Scribner* v. *O'Brien, Inc.,* 169 Conn. 389, 404, 363 A.2d 160 (1975) (builder undertaking supervision of construction and present at construction site personally liable for negligence causing flooding of site). "Thus, a director or officer who commits the tort or who directs the tortious act done, or participates or operates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort." (Internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC,* 275 Conn. 105, 142, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d. 664 (2006). General Statutes § 34-134[13] "evinces no legislative intent to eliminate the right to impose liability on a member or manager of a limited liability company who has engaged in or participated in the commission of tortious conduct. Rather, the statute merely codifies the well established principle that an officer of a corporation does not incur personal liability for its torts merely because of his official position." (Internal quotation marks omitted.) Id., 145.

In *Ventres,* our Supreme Court affirmed the imposition of individual tort liability on a corporate officer without piercing the corporate veil. In that case, the defendant, who was the sole member of the codefendant airport company, was held personally liable for trespass; id., 110–13; despite his claim that he acted

---

[13] General Statutes § 34-134 provides: "A member or manager of a limited liability company is not a proper party to a proceeding by or against a limited liability company solely by reason of being a member or manager of the limited liability company, except where the object of the proceeding is to enforce a member's or manager's right against or liability to the limited liability company or as otherwise provided in an operating agreement."

solely as a corporate officer when he ordered that trees on a neighboring land trust be cleared. Id., 141. The court reasoned that, because there was ample evidence demonstrating that the defendant had ordered the clearing, he was liable for trespass, regardless of whether he was acting in his individual capacity or on behalf of the corporation. Id., 142–43.

Silvestri argues that *Ventres* does not govern this case because there was no evidence at trial demonstrating that he personally had ordered the debris to be buried under the carriage house foundation. This argument overlooks the court's express finding that he personally caused a large amount of construction debris to be placed on the Coutos' property and that the Coutos were damaged by that trespass.[14]

The evidence of record supports the court's findings. Jane Couto testified that Silvestri ceased work on the construction project in March, 2007. John Couto testified that the debris on lot 5 was discovered about a year after that time, in March, 2008, and was identified as originating from the foundation of the original carriage house constructed by Silvestri. He further testified that the parties had determined that the foundation was too small to accommodate the carriage house and that Silvestri, despite his promise to take remedial measures, had failed to complete them. Peter Giordano, the home builder hired by the Coutos after the relationship with Silvestri had come to an end, testified that during the continued construction of the carriage house, debris such as pipes, tires and large boulders had been discovered buried under its foundation. In the absence of

---

[14] In holding him liable for trespass, the court also found that Silvestri "wilfully prevented the Coutos from accessing the sewer line, requiring the Coutos to obtain relief by suing to prevent [him] from continuing to block their access to the sewer line to which they were so clearly entitled." Silvestri does not challenge this finding on appeal.

evidence of any other intervening cause, the court logically inferred that the debris would not have been buried on lot 5 unless it had been placed there at Silvestri's direction or through his negligence.

When reviewing a court's conclusion for clear error, we may not disturb findings of fact if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, the trier of fact reasonably could have found as it did. See *Suresky* v. *Sweedler*, 140 Conn. App. 800, 807, 60 A.3d 358 (2013). The trial court in the present case reasonably decided, on the basis of the testimony presented at trial and the reasonable inferences drawn therefrom, that Silvestri was personally responsible for the debris that damaged the Coutos' property, notwithstanding the joint and several liability of his two businesses.

### III

Finally, Silvestri claims that the court improperly held him personally liable for violations of CUTPA. He again argues that as a corporate officer, he is not personally liable for the actions of his businesses and, furthermore, that the factual foundation required to find a violation of CUTPA was lacking because the court failed to find him liable for fraud. We disagree.

For the reasons already discussed, the court did not pierce the corporate veil in finding that Silvestri had personally violated CUTPA, but rather held him liable for his actions as an individual. Specifically, the court found that Silvestri had violated CUTPA through his own actions, which the court described as "unscrupulous, oppressive, unfair and deceptive." "It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . .

[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Rana* v. *Terdjanian*, 136 Conn. App. 99, 122, 46 A.3d 175, cert. denied, 305 Conn. 926, 47 A.3d 886 (2012).

In support of its determination that Silvestri violated CUTPA, the court cited, among other evidence, his failure to obtain financing and placement of responsibility for financing on the Coutos, the pressure he exerted on them to convince them to accept contract modifications, his demand for payment beyond what had been earned and his dumping of debris on their property. These findings, which we find to be supported in the record, justify a court's determination of a personal violation of CUTPA, even without a finding of fraud. "Although CUTPA is primarily a statutory cause of action; see General Statutes § 42-110b;[15] it equally is recognized that CUTPA claims may arise from underlying causes of action, such as contract violations or torts . . . ." *Sturm* v. *Harb Development, LLC*, supra, 298 Conn. 139.

"Our Supreme Court has affirmed the imposition of individual tort liability, without requiring the piercing of the corporate veil to hold a corporate officer personally liable for *tortious* conduct in which the officer *directly* participated, regardless of whether the statutory basis for the claim expressly allows liability to be imposed on corporate officers." (Emphasis in original; internal quotation marks omitted.) *Cohen* v. *Roll-A-Cover, LLC*, supra, 131 Conn. App. 469. Here, the court properly

---

[15] General Statutes § 42-110b provides in relevant part: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

found that Silvestri personally engaged in tortious conduct directed at the Coutos. Accordingly, we conclude that the court's finding that Silvestri was personally liable for his conduct under CUTPA was not clearly erroneous.

We commend the trial court for its meticulous assessment of the facts and the law of a complex commercial relationship between a professional builder and first time home buyers.

The judgments are affirmed.

In this opinion the other judges concurred.