******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOSEPH GENERAL CONTRACTING, INC. *v.*
JOHN COUTO ET AL.

JOHN COUTO ET AL. *v.* LANDEL
REALTY, LLC, ET AL.
(SC 19209)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued December 9, 2014—officially released July 21, 2015*

*Thomas J. Londregan*, with whom were *Ralph J.
Monaco*, and, on the brief, *Brian K. Estep*, for the appel-
lant (Anthony Silvestri).

*Jennifer Antognini-O'Neill*, with whom was *John C.
Zaccaro, Jr.*, for the appellees (John Couto et al.).

*Patrick M. Fahey* filed a brief for the Home Builders
and Remodelers Association of Connecticut, Inc., as
amicus curiae.

*Opinion*

EVELEIGH, J. The appellant Anthony J. Silvestri[1] appeals from the judgment of the Appellate Court affirming the judgment of the trial court in favor of the appellees, John Couto and Jane Couto.[2] The trial court had found Silvestri personally liable for, inter alia, breach of contract, breach of implied warranty, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The dispositive issue in this appeal is whether the Appellate Court properly affirmed the judgment of the trial court finding that Silvestri, in his individual capacity, had incurred individual contractual obligations to the Coutos and was, therefore, personally liable for damages that the Coutos sustained as a result of his actions. We affirm in part and reverse in part the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts and procedural history. "On June 27, 2007 . . . Joseph General Contracting, Inc. (Joseph General), filed two separate complaints against the [Coutos]. The first action contained five counts and raised claims of breach of contract, and the second action sought to foreclose a mechanic's lien held by Joseph General on the Coutos' property. The Coutos denied their liability and asserted various special defenses, including allegations that [Silvestri, who was] the owner and president of Joseph General . . . personally had induced them to enter into a contract through material misrepresentations, that [Joseph General's] claims were barred by its own breach of contract and warranty, and that Joseph General had been fully paid for the work it completed in accordance with the contractual agreement.

"The Coutos also filed a six count counterclaim against Joseph [General], alleging violation of General Statutes § 47-200 et seq., the Common Interest Ownership Act, breach of contract, fraud, breach of implied warranty, trespass and violation of . . . [CUTPA]. Subsequently, the Coutos . . . commenced a separate action on February 6, 2009, against Silvestri, the sole owner and shareholder of Joseph General, and Landel Realty, LLC (Landel), of which Silvestri is also the sole owner. That action incorporated the allegations of the Coutos' counterclaim, in addition to alleging intentional infliction of emotional distress and seeking declaratory relief pursuant to the Common Interest Ownership Act. A consolidated trial of [these actions] was held before the court [in May, 2011].

"After trial, the court rendered judgment in favor of Joseph General, Landel, and Silvestri as to the Coutos' claims of fraud, violation of the Common Interest Ownership Act and intentional infliction of emotional distress. The [trial] court rendered judgment in favor of the

Coutos as to all other counts, holding Joseph General, Landel and Silvestri each jointly and severally liable for breach of contract and implied warranty, trespass and violation of CUTPA, awarding a total of approximately $573,659 in damages. On appeal to [the Appellate Court], Silvestri challenge[d] the propriety of these adverse rulings with respect to his personal liability.

"In view of the evidence presented in the consolidated trial of these actions, the [trial] court reasonably could have found the following facts. In 2006, the Coutos entered into a written contract with Joseph General for the purchase and construction of a home and carriage house to be built on a piece of property in the Admiral Cove subdivision in Stonington (lot 5), for the price of $1,980,000. The carriage house was intended for use as a separate dwelling for the Coutos' special needs daughter, a purpose of which Silvestri was aware. At the time the contract was signed, Silvestri assured the Coutos that if they did not like the home and the carriage house, they would not be obligated to buy lot 5 or the completed dwellings. Although the contract terms were vague, they specified that the new home was to be of like kind and quality, and built with the same materials as used in a model home also located in Admiral Cove, which previously had been constructed by Joseph General, Landel and Silvestri, collectively. The architect who designed the model house was also to design the two dwellings on lot 5 for the Coutos. Silvestri knew, however, that the zoning requirements regulating Admiral Cove contained a single-family dwelling restriction applicable to each of the lots in the development. At the time they signed the contract, the Coutos were unaware of this zoning restriction.

"Although the original contract for the development of the new home and carriage house was executed between the Coutos and Joseph General, the parties also proceeded to negotiate additional oral agreements to supplement its terms. . . . The trial court apparently found credible the testimony of the Coutos that, throughout the continued construction process, they were confused as to whom they were dealing with. The Coutos also entered into a written agreement to deliver funds to escrow in payment for a security card system, docking installation, docking permits and estate paving, as well as a second written contract relating to a construction loan obtained by the Coutos. Both of these agreements were signed by Silvestri, individually, and on behalf of Landel. In light of this evidence presented at trial, the trial court determined that a contract existed not only between Joseph General and the Coutos, but also between the Coutos, Landel and Silvestri.

"The evidence at trial showed that, as the construction process continued, Silvestri had financial difficulties in performing his obligations. The Chelsea Groton Savings Bank declined to provide financing because the

bank did not believe that extending further funds to Silvestri was prudent. Silvestri represented to the Coutos that the reason for the bank's refusal to finance the project was that the Coutos were reserving their right to decline to buy the property until after the two buildings had been constructed. He misinformed the Coutos that, regardless of the express terms of their contract, they were likely to lose their deposits under the contract if they did not pay for the construction upfront. So threatened, the Coutos acquiesced and agreed to purchase lot 5 from Landel, giving up their contractual right to reject the construction development in its entirety if it was not completed to their satisfaction. The Coutos paid a total of $880,000 to purchase lot 5 from Landel and to have Silvestri and Joseph General complete the construction of their new home and carriage house. The Coutos also obtained a construction loan from the Chelsea Groton Savings Bank to help finance the construction. A new agreement incorporating these modifications was drafted by the Coutos and Joseph General, but was never signed by either party.

"After the Coutos' payment of the purchase price for lot 5 and the construction of the two contemplated dwellings, work pursuant to the contract began, but not without further setbacks. First, Silvestri informed the Coutos that the agreed upon architect was no longer available, and that he would have to substitute a different designer. The first design of the primary dwelling produced by the substitute architect was larger than the design previously agreed to, and Silvestri instructed him to reduce its size. As construction of the house progressed, however, it became clear that many of the rooms in the house would not be functional because necessary appliances such as toilets and sinks did not fit within the shrinking size of the house. The Coutos also had difficulty purchasing fixtures for the dwellings within the allowances set forth in the contract.

"At this point Silvestri, Joseph General and Landel had been compensated for their work performed to date. Nonetheless, Silvestri demanded another large progress payment, which, as the trial court found, the Coutos reasonably refused to pay until the issue with the allowances for fixtures had been resolved. After their refusal to remit another payment, Silvestri ceased construction of the dwellings and obtained a mechanic's lien on lot 5. In addition, he covered and thereby prevented the Coutos from accessing the sewer line on their property.

"Forced to complete the construction of their home through a new, substitute contractor, the Coutos discovered numerous other problems with poor workmanship, as well as a large quantity of debris that had been buried under, and caused damage to, the portion of lot 5 designated for the construction of the carriage house.

The new contractor also informed the Coutos about the single-dwelling zoning restriction on the property. At that point, they applied for a zoning variance to allow construction to continue on the carriage house, but their application was denied." (Footnotes omitted.) *Joseph General Contracting, Inc.* v. *Couto*, 144 Conn. App. 241, 243–49, 72 A.3d 413 (2013). Additional facts will be set forth as necessary.

Silvestri appealed to the Appellate Court, claiming that: "(1) the evidence presented was insufficient to hold him personally liable for breach of contract and breach of implied warranty, (2) the [trial] court improperly found him individually liable for trespass without expressly finding that he personally had buried debris on the Coutos' property and (3) the evidence did not support a finding that his behavior amounted to a personal violation of CUTPA." Id., 249.

The Appellate Court held that "[a]lthough, at the outset, Silvestri disclosed the identity of his principals, it was reasonable for the [trial] court to find that, thereafter, he did not clearly inform the Coutos that he continued, at all times, to be acting in a representative rather than in an individual capacity. In light of that finding, it was not clear error for the [trial] court to find that Silvestri was a party to the modified contract and hence personally liable for breach of contract." Id., 253–54. Further, the Appellate Court concluded that "[t]he trial court in the present case reasonably decided, on the basis of the testimony presented at trial and the reasonable inference drawn therefrom, that Silvestri was personally responsible for the debris that damaged the Coutos' property, notwithstanding the joint and several liability of his two businesses." Id., 258. Finally, the Appellate Court held that "[h]ere, the court properly found that Silvestri personally engaged in tortious conduct directed at the Coutos." Id., 259–60. Accordingly, the Appellate Court "conclude[d] that the [trial] court's finding that Silvestri was personally liable for his conduct under CUTPA was not clearly erroneous." Id., 260. Therefore, the Appellate Court affirmed the judgment of the trial court pertaining to Silvestri in an individual capacity. Id.

Silvestri petitioned for certification to appeal from the judgment of the Appellate Court. This court granted the petition for certification to appeal limited to the following issues: (1) "Did the Appellate Court properly determine that . . . Silvestri had incurred contractual obligations to the [Coutos] in his individual capacity?"; and (2) "Did the Appellate Court properly determine that . . . Silvestri could be held individually liable for alleged violations of [CUTPA] . . . ?" *Joseph General Contracting, Inc.* v. *Couto*, 310 Conn. 924, 77 A.3d 139 (2013). We answer the first question in the negative, and the second question in the affirmative.

On appeal to this court, Silvestri asserts that the

Appellate Court improperly affirmed the judgment of the trial court finding that he had incurred contractual obligations to the Coutos in his individual capacity. The Coutos counter that the Appellate Court properly concluded that the factual findings of the trial court support its conclusion that Silvestri was a party to the contract and that the judgment of the Appellate Court is consistent with contract law. Further, the Coutos assert that Silvestri failed to prove agency. We agree with Silvestri that the Appellate Court improperly affirmed the judgment of the trial court holding him personally liable on the contract and implied warranty claims. We agree with the Coutos that the Appellate Court properly concluded that Silvestri could be held individually liable for the alleged violations of CUTPA. We therefore affirm in part and reverse in part the judgment of the Appellate Court.

I

CONTRACT AND IMPLIED WARRANTY

The first issue requires us to determine whether the Appellate Court properly affirmed the judgment of the trial court finding that Silvestri was a party to the contract and, therefore, was liable for breach of contract and breach of an implied warranty.

As a threshold matter we set forth the standard of review and legal principles applicable to this claim. "Whether a contract exists is a question of fact for the court to determine." *Randolph Construction Co.* v. *Kings East Corp.*, 165 Conn. 269, 277, 334 A.2d 464 (1973). "The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . . If the language of [a] contract is susceptible to more than one reasonable interpretation, [however] the contract is ambiguous. . . . Ordinarily, such ambiguity requires the use of extrinsic evidence by a trial court to determine the intent of the parties, and, because such a determination is factual, it is subject to reversal on appeal only if it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007). "In order to prove that a contract has been modified, the party asserting the modification must show mutual assent to its meaning and conditions. . . . Whether the parties intended to modify their contract is a question of fact." (Citations omitted; internal quotation marks omitted.) *Three S. Development Co.* v. *Santore*, 193 Conn. 174, 177–78, 474 A.2d 795 (1984).

In the present case, there is no dispute that on July

10, 2006, the Coutos and Joseph General entered into a contract, which was entitled "Preliminary draft outline for a new home package." That contract was for the sale of land and construction of a home known as 145 Whitehall Avenue in Stonington. Addendum I of the contract provided for the construction of an "oversized [two car] garage carriage house" that was twenty-six feet by twenty-eight feet in size and was to be built to the "[s]ame exterior specs as [the] home." The Coutos signed the contract and Silvestri signed as president of Joseph General. The contract also provided that: "This [c]ontract shall apply to and bind the heirs, executors, successors and assigns of the parties hereto, and may be modified only by written agreement signed or initialed by both of the parties." On July 10, 2006, the Coutos paid Joseph General $5000 as a down payment. A subsequent document entitled "Contract for Sale of Real Estate" was signed between the Coutos and Joseph General on August 22, 2006. Silvestri signed this document as the President of Joseph General. That contract provided for a total purchase price of $1,980,000 for the property and construction of the two premises and also contained a more detailed description of the specifications. The property was described as 145 Whitehall Avenue. That contract contained the same provision as the initial contract to the effect that all changes and modifications had to be in writing and agreed to by the parties. The parties do not contest the fact that all payments regarding the property and construction were made either to Landel or Joseph General.[3]

There is no question that the construction of the Coutos' home was governed by the construction contract, which was executed by the Coutos and Joseph General and was not signed by Silvestri, individually. The parties do not dispute, and the Appellate Court did not conclude, that the terms of the construction contract were grounds for holding Silvestri liable for breach of contract and implied warranty.

Similarly, the trial court refused to use the doctrine of piercing the corporate veil to hold Silvestri liable for breach of contract. Instead, the trial court found that Silvestri and his business entities were engaged in "joint action" such that it was appropriate to hold all of them jointly and severally liable for their collective actions. The trial court and the Appellate Court did not cite any authority for this "joint action" theory of liability. We disagree with the notion that proving "joint action" between an entity and one of its owners and officers is the basis for finding liability. Indeed, such a theory ignores the reality that this court has recognized that "the fact that [an owner of a corporation] acted on behalf of [the corporation] is no more than a reflection of the reality that all corporations act through individuals. It is axiomatic that while such an entity has a distinct legal life, it can act only through individuals." (Internal quotation marks omitted.) *Naples* v. *Keystone Build-*

*ing & Development Corp.*, 295 Conn. 214, 237, 990 A.2d 326 (2010).

The trial court found as follows: "[T]here was a contract between the parties, although heaven knows, it will never be in the finals for contract of the year or month or day. And it wasn't as bad, as far as it went, given the time that people had to draw it up, but then the parties proceeded to work with an ongoing series of oral [agreements] that supplemented, amplified, and to some extent contradicted that contract." The Appellate Court concluded that that the record supported the trial court's finding that through his conduct, Silvestri personally had become a party to the contract. *Joseph General Contracting, Inc.* v. *Couto*, supra, 144 Conn. App. 252–53. We disagree.

We recognize that "[a] written contract can be modified by a subsequent parol agreement if that is the intention of the parties." *Grote* v. *A. C. Hine Co.*, 148 Conn. 283, 286, 170 A.2d 138 (1961). "[It does not] make any difference that the original written contract provided that it should not subsequently be varied except by writing. This stipulation itself may be rescinded by parol and any oral variation of the writing which may be agreed upon . . . ." 15 S. Williston, Contracts (3d Ed. 1972) § 1828, p. 496. Nevertheless, it is important to remember that Silvestri was not a party to the initial contract regarding the construction of the house and, therefore, could not modify it. A modification to an existing contract can only be brought about by agreement of the parties to the contract to be modified. See, e.g., *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 189–90, 2 A.3d 873 (2010) ("[p]arties may alter any term of an existing contract . . . [t]he contract as modified becomes a new contract between the parties" [internal quotation marks omitted]); see also *Hess* v. *Dumouchel Paper Co.*, 154 Conn. 343, 348, 225 A.2d 797 (1966) ("[s]eparate dealings among the parties cannot affect another transaction so as to constitute a substituted contract between them unless it was their intention that such an agreement be consummated"). Further, "[p]arties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract, and, in any event, in order to bind a third person contractually, an expression of assent by such person is necessary." (Internal quotation marks omitted.) *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 797, 17 A.3d 40 (2011).

Where a substitute contract is entered into, and that contract "includes as a party one who was neither the obligor nor the obligee of the original duty," the resulting contract is a novation. See 2 Restatement (Second), Contracts § 280 (1981). "A novation is subject to the same requirements as any other contract, including that of consideration." Id., comment (c), p. 378. In order to "form a valid and binding contract in Connecticut,

there must be a mutual understanding of the terms that are definite and certain between the parties." *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 534, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999). "In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make." (Internal quotation marks omitted.) *Electrical Wholesalers, Inc.* v. *M.J.B. Corp.*, 99 Conn. App. 294, 302, 912 A.2d 1117 (2007). We have recognized that "[a]n authorized agent for a disclosed principal, in the absence of circumstances showing that personal responsibility was incurred, is not personally liable to the other contracting party." (Internal quotation marks omitted.) *Whitlock's, Inc.* v. *Manley*, 123 Conn. 434, 437, 196 A. 149 (1937).

In the present case, both the trial court and the Appellate Court looked to other agreements entered into between the Coutos and Silvestri, individually and on behalf of his business entities, as evidence that the distinction between corporate and personal liability was blurred for purposes of the original construction contract. We disagree. The clarity with which the parties undertook different contractual engagements has no bearing on, and does not alter or amend, the explicit terms of the construction agreement. The existence of these other contracts merely displayed that the parties knew how to insert Silvestri's name when they chose to do so and intended him to be personally liable on the respective contracts. The fact that his name was not on the original construction contract in an individual capacity is indicative of the fact that no personal liability was intended. We note also that the other two contracts relied upon by both the trial court and the Appellate Court were both signed on September 20, 2006.[4] One of those contracts specifically indicates that: "[Whereas], the [b]uyers are negotiating a [c]onstruction [c]ontract *with Joseph General* . . . ." (Emphasis added.) The recognition that the construction project was with Joseph General contradicts the trial court's holding that the parties had engaged in such " 'joint action' " that "it became unclear to [the Coutos] with whom they were transacting business." *Joseph General Contracting, Inc.* v. *Couto*, supra, 144 Conn. App. 252. To the contrary, the fact that, on the same day that the Coutos entered into some contracts with Silvestri as an individual they still acknowledged an intent to enter into a construction contract with Joseph General, and not Silvestri, is evidence that they understood that Silvestri was not a party to the construction contract.

The Coutos argue that whether a contract existed between them and Silvestri is a question of fact and

that the trial court ruled in their favor. They contend that Silvestri's argument focuses only on the 2006 construction contract and ignores the trial court's findings as to Silvestri's personal promises. The Coutos further cite to general agency law for the proposition that, to avoid personal liability, an agent must disclose both the fact that he is acting in a representative capacity and the identity of his principal, since the party with whom he deals is not required to discover or to make inquiries to discover these facts. See 2A C.J.S. 624, Agency § 359 (2003). We are not persuaded. While we will give every deference to the trial court when it finds facts, we exercise plenary review in determining the correct application of the law to the facts as found.

Therefore, we conclude, in the exercise of our plenary review, that the facts as found by the trial court are not sufficient, as a matter of law, to impose individual liability on Silvestri based on a theory that the construction agreement had been modified. It is undisputed that Silvestri signed the construction agreement on behalf of Joseph General in his capacity as president. None of the additional contracts signed by Silvestri related to the actual physical construction of the structures on the property. Even the agreement regarding the construction loan indicated that the Coutos were negotiating with Joseph General for the construction of the house. In order to change this relationship there had to be facts evidencing a clear intention on the part of the parties to modify the original construction contract. The cited actions of Silvestri were not sufficient to establish this fact since they do not display an agreement of the parties to change the initial contract between the parties.

Because Silvestri was not a party to the original construction contract, there would have had to be a meeting of the minds, with consideration, to alter the parties to that contract.[5] A review of the record compels us to reach the opposite conclusion. As stated previously in this opinion: "A novation is subject to the same requirements as any other contract, including that of consideration." 2 Restatement (Second), supra, § 280, comment (c), p. 378. There is no evidence in the record that there was any additional consideration to the original contract between the Coutos and Joseph General.[6]

Finally, it has been held that an agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute his personal liability for, or to, that of his principal. *Leutwyler* v. *Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 309 (S.D.N.Y. 2001). The two contracts signed in July and August unquestionably demonstrated that Silvestri was acting on behalf of Joseph General. He signed both of the contracts as its president. In order to impose personal liability upon Silvestri there would have had to have been an explicit agreement between the Coutos

and Silvestri or explicit conduct demonstrating a new agreement. In the absence of such evidence "[a] third party's knowledge of an agent's capacity, obtained from prior transactions, is deemed to continue for subsequent transactions of the same character and between the same parties." 2 Restatement (Third), Agency § 6.01, comment (d) (1), p. 12 (2006). There is simply no evidence that Silvestri was acting as anything other than an agent for Joseph General and, therefore, there is no legal basis to impose individual liability upon him.

For the foregoing reasons, we conclude that the Appellate Court improperly held that Silvestri was individually liable on the breach of contract claim regarding the construction contract. Accordingly, we reverse the judgment of the Appellate Court as to the individual liability of Silvestri regarding both the breach of contract and the implied warranty claims.[7]

## II

## CUTPA

Silvestri claims next that the Appellate Court improperly affirmed the judgment of the trial court against him on the CUTPA claim. Specifically, Silvestri asserts that, as a corporate officer, he is not liable under CUTPA for the acts of his entities and that, in any event, the record does not support any liability under CUTPA. We disagree.

In their pleadings, the Coutos incorporated various factual allegations from other counts and claimed that the actions described in those allegations constituted unfair or deceptive acts or practices in the conduct of trade or commerce. The trial court agreed, finding that "many of the actions taken by . . . Silvestri and his companies were indeed unscrupulous, oppressive, unfair and deceptive, among them blaming the Coutos for his inability to obtain the financing necessary to fulfill his contractual obligations, pressuring the Coutos into a changed arrangement for the house construction, the blatant attempt to force money that was not owed by welding the access cover to the unconnected sewer closed and dumping debris on the Coutos' property." Accordingly, the trial court concluded that "the Coutos had proved their CUTPA claim" against Silvestri, Landel, and Joseph General.[8] Subsequently, the court awarded $125,000 in CUTPA damages in the form of counsel fees against Silvestri, Landel, and Joseph General.

We have previously held that "an officer of a corporation does not incur personal liability for its torts merely because of his official position. Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby." *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 404, 363 A.2d 160 (1975); see also *Ventres* v.

*Goodspeed Airport, LLC*, 275 Conn. 105, 141–42, 881 A.2d 937 (2005) (officer was personally liable in tort for trespass in ordering trees on neighboring property cut down), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006).

In *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 139 n.17, 2 A.3d 859 (2010), we indicated that it was an open question whether the same rule applied to CUTPA claims. Although the parties in *Sturm* had assumed that there could be individual liability for a corporate entity's violation of CUTPA, our disposition of the case on other grounds precluded us from having to decide the issue, thereby leaving its resolution "for another day."[9] Id. That day has now arrived.

At the outset, we set forth the standard of review. The resolution of this issue requires us to interpret CUTPA. "Well settled principles of statutory interpretation govern our review. . . . Because statutory interpretation is a question of law, our review is de novo. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *McCoy* v. *Commissioner of Public Safety*, 300 Conn. 144, 150–51, 12 A.3d 948 (2011).

We begin with the relevant statutory text. General Statutes § 42-110b provides in relevant part: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

"(b) It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act . . . as from time to time amended. . . .

"(d) It is the intention of the legislature that this chapter be remedial and be so construed."

General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ." General Statutes § 42-110a (3) defines the word " '[p]erson' " as a "natural person, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, and any other legal entity . . . ."

The plain language of § 42-110b. clearly indicates that an individual can be liable for a CUTPA violation. Section 42-110b (a) begins with the phrase "[n]o person shall engage in unfair methods of competition . . . ." Further, part of the definition of person includes the term "natural person . . . ." General Statutes § 42-110a (3). Thus, the plain language of CUTPA provides for the imposition of liability on a natural person.

The next question we consider is whether liability under CUTPA may be extended to an individual who engages in unfair or unscrupulous conduct on behalf of a business entity. Section 42-110b directs us to look to the federal courts' interpretation of CUTPA's federal statutory counterpart, the Federal Trade Commission Act (federal act), 15 U.S.C. § 41 et seq. (2006), when determining the scope and meaning of CUTPA.[10] Our review of federal case law discloses that, the practice of holding individuals responsible for wrongful acts taken on behalf of business entities, is widespread and well accepted in federal courts, as evidenced by judicial decisions from several federal circuits. See *POM Wonderful, LLC* v. *Federal Trade Commission*, 777 F.3d 478, 498–99 (D.C. Cir. 2015); *Federal Trade Commission* v. *E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636 (6th Cir. 2014); *Federal Trade Commission* v. *IAB Marketing Associates, L.P.*, 746 F.3d 1228, 1230–31 (11th Cir. 2014); *Federal Trade Commission* v. *Ross*, 743 F.3d 886, 892 (4th Cir.), cert. denied,     U.S.    , 135 S. Ct. 92, 190 L. Ed. 2d 38 (2014); *Federal Trade Commission* v. *Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12–13 (1st Cir. 2010); *Federal Trade Commission* v. *Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009); *Federal Trade Commission* v. *Freecom Communications, Inc.*, 401 F.3d 1192, 1202–1203 (10th Cir. 2005); *Federal Trade Commission* v. *Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); see also *Federal Trade Commission* v. *Instant Response Systems, LLC*, United States District Court, Docket No. 13 Civ. 00976 (ILG), 2015 WL 1650914, *9 (E.D.N.Y. April 14, 2015); *Federal Trade Commission* v. *Millennium Telecard, Inc.*, United States District Court, Docket No. 11-2479 (JLL), 2011 WL 2745963, *9

(D.N.J. 2011); *Berglund* v. *Cynosure, Inc.*, 502 F. Supp. 2d 949, 956 (D. Minn. 2007); *Federal Trade Commission* v. *National Business Consultants, Inc.*, 781 F. Supp. 1136, 1152 (E.D. La. 1994).

The test used by the federal courts is uniformly stated, but it is flexible and highly fact specific in application. In order to hold an individual liable, a plaintiff, after showing that an entity violated the federal act, must prove that the individual either participated directly in the entity's deceptive or unfair acts or practices, or that he or she had the authority to control them. See *Federal Trade Commission* v. *Amy Travel Service, Inc.*, supra, 875 F.2d 573. The plaintiff then must establish that the individual had knowledge of the wrongdoing at issue. Id.

An individual's status as controlling shareholder or officer in a closely held corporation creates a presumption of the ability to control; *Federal Trade Commission* v. *E.M.A. Nationwide, Inc.*, supra, 767 F.3d 636; but is not necessarily dispositive in all cases. See, e.g., *Federal Trade Commission* v. *Publishers Business Services, Inc.*, 540 Fed. Appx. 555, 558 (9th Cir. 2013) (corporate title alone insufficient to establish individual liability), cert. denied, U.S. , 134 S. Ct. 2724, 189 L. Ed. 2d 763 (2014). On the other hand, an employee who is not an owner or officer may, under some circumstances, possess the requisite authority. See, e.g., *Federal Trade Commission* v. *Bay Area Business Council, Inc.*, 423 F.3d 627, 638 (7th Cir. 2005) (salaried employee who handled corporate finances, transferred funds to pay entities' expenses and possessed signing authority on corporate accounts "had ample authority to control" corporate defendants); *Federal Trade Commission* v. *Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985) (office manager individually liable under federal act where own admissions and other evidence showed he possessed and exercised authority to control company and knowingly engaged in its fraudulent practices). Authority to control may be established by evidence of an individual's conduct, such as his or her "active involvement in business affairs and [participation in] the making of company policy." (Internal quotation marks omitted.) *Federal Trade Commission* v. *IAB Marketing Associates, L.P.*, supra, 746 F.3d 1233. Evidence that other employees of an entity deferred to the individual also is relevant. See *Federal Trade Commission* v. *Freecom Communications, Inc.*, supra, 401 F.3d 1205.

The knowledge requirement may be established with evidence showing that the individual "had actual knowledge of [the entity's] material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." (Internal quotation marks omitted.) *Federal Trade Commission* v. *Bay Area Business Council, Inc.*,

supra, 423 F.3d 636. "An individual's degree of participation in business affairs is probative of knowledge. . . . [T]he [plaintiff] is not required to show that a defendant *intended* to defraud consumers in order to hold that individual personally liable." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Federal Trade Commission* v. *Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008). A good faith belief in the truth of a misrepresentation may, however, preclude individual liability under the federal act.[11]

The requirements of this test will necessarily preclude certain types of liability under CUTPA, namely, liability for merely negligent acts of an individual or the negligent acts of another, subordinate person in service to an entity. In order for any individual liability to attach under CUTPA, someone must knowingly or recklessly engage in unfair or unscrupulous acts, as contemplated by the statute, in the conduct of a trade or business.[12]

In the present case, there is no question that Silvestri controlled the corporations involved and was actively engaged in the business relationship with the Coutos. Silvestri was the president and sole shareholder of Joseph General, and the managing member and sole owner of Landel. The trial court found that Silvestri was rejected for certain financing because he already owed the bank too much, but he told the Coutos, untruthfully, that financing was unavailable because they had reserved money through their loan commitment to purchase the property when construction was completed. The trial court also found that Silvestri led the Coutos to believe, inaccurately, that they would forfeit a substantial deposit, thereby pressuring them to agree to an unfavorable restructuring of the transaction. The court further found that the Coutos were "clearly entitled" to access the sewer line, but that Silvestri "wilfully prevented" them from accessing it after the Coutos refused to make a payment that they did not in fact owe. Finally, the court attributed the dumping of construction debris on the Coutos' property to Silvestri.

Applying the federal test, based on these findings, Silvestri either directly participated in the wrongful conduct or, by virtue of his ownership, position and day-to-day involvement in Joseph General and Landel, had the ability to control it. Moreover, given the character of the actions at issue, Silvestri necessarily knew or should have known of their wrongfulness. We are convinced, therefore, that the trial court properly found Silvestri personally liable under CUTPA. Although federal decisions are not strictly controlling on this court, we find the reasoning of those decisions persuasive and use them as guidance as directed by the plain language of the statute.

Our conclusion that individual liability may attach

under the circumstances of this case also supports the remedial nature of the statute and the ultimate protection of the consumer. See General Statutes § 42-110b (d) (legislature's intent is that CUTPA be construed as remedial).

We conclude, therefore, that the Appellate Court properly affirmed the judgment of the trial court as to Silvestri's individual liability under CUTPA.

The judgment of the Appellate Court is reversed only as to the claims of breach of contract and implied warranty against Silvestri in his individual capacity, and the case is remanded to that court with direction to reverse the judgment of the trial court on those claims and to remand the case to the trial court with direction to render judgment in favor of Silvestri. The judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

[1] We note that, although Joseph General Contracting, Inc., and Landel Realty, LLC, are also appellants in the present appeal, those parties did not file briefs or participate in oral argument. See *Joseph General Contracting, Inc.* v. *Couto*, 144 Conn. App. 241, 245 n.8, 72 A.3d 413 (2013).

[2] As we explain subsequently in this opinion, the present appeal involves three distinct civil actions. In both the first and second actions, Joseph General Contracting, Inc., is the plaintiff and John Couto and Jane Couto are the defendants. In the third action, John Couto and Jane Couto are the plaintiffs and Silvestri, Joseph General Contracting, Inc., and Landel Realty, LLC, are the defendants. For the sake of clarity, we refer to these parties by name.

[3] Joseph General was to construct the home, while Landel owned the real property on which it was constructed.

[4] Specifically, when a question arose concerning financing for the project, an agreement was signed on September 20, 2006, by the Coutos, Landel, and Silvestri, individually. That agreement referenced the fact that the Coutos, who were referred to as the "[b]uyers," had entered into a construction loan with Chelsea Groton Savings Bank, and that Landel and Silvestri, who were referred to as the "[s]ellers," agreed to pay any interest due on any construction draws and any insurance required. The Coutos agreed to reimburse Landel and Silvestri, without interest, for the land interest payments. One of the recital clauses to the contract read as follows: "[Whereas], the [b]uyers are negotiating a [c]onstruction [c]ontract with Joseph General . . . ." On the same date, another agreement was signed by the Coutos, Landel, and Silvestri, individually. This agreement was entitled "Escrow Agreement" and provided for $15,000 to be placed with an escrow agent pending completion of a gate with security card system, confirmation that the docking permits shall be issued and the installation of docks and the remaining estate paving. The agreement refers to the Coutos as the "[b]uyers" and to Landel and Silvestri, individually, as the "[s]ellers." The first clause of this contract reads as follows: "Wherein [s]ellers desire to convey the property listed above to the [b]uyers, and the [b]uyers desire to obtain said property; and wherein [b]uyers and [s]ellers acknowledge that certain work needs to be done in accordance with their purchase and sale agreement." On September 20, 2006, Landel conveyed lot 5 to the Coutos for $880,000.

[5] The following testimony by Jane Couto, which was given on direct examination by counsel for Silvestri, suggests confusion even as to the original parties to the contract.

"Q . . . You understood at that time in July of 2006 that Joseph General . . . would be performing the construction work at the property, correct? . . .

"A. They were doing construction on the property.

"The Court: They is who?

"A. [Silvestri]—Landel—I don't know who was in charge of what exactly for the construction. Your Honor. I'm sorry."

This testimony was adduced despite the fact that the Coutos had signed two previous contracts identifying Joseph General as the contractor and

had acknowledged in a separate agreement that they were negotiating with Joseph General to perform the construction work on the property. At the very least the testimony demonstrated the fact that there was no meeting of the minds regarding changing the parties to the original contract if the Coutos were not even aware of the party with whom they had initially agreed to perform the work.

[6] We note that rights and obligations may arise from acts of the parties, usually their words, upon which a reasonable person would rely. See 1 E. Farnsworth, Contracts (3d Ed. 2004) § 3.6, pp. 209–10. There is no evidence in the present case to suggest, however, that there were any actions which had been intended to change the original parties to the contract.

[7] We note that we have previously held that the implied warranty cause of action only exists if there is a breach of contract; it does not stand as a separate cause of action. Therefore, in view of the fact that we have decided that Silvestri was not personally liable under the contract, there is no liability for breach of an implied warranty. See *Borucki* v. *MacKenzie Bros. Co.*, 125 Conn. 92, 96, 3 A.2d 224 (1938).

[8] As part of his argument that he should not be held individually liable under CUTPA, Silvestri contends that the trial court's factual findings relating to each of the acts constituting a violation of CUTPA were clearly erroneous. These claims are without merit. The trial court had adequate evidence upon which to base its findings regarding CUTPA, such that we cannot hold that those findings were clearly erroneous. Regarding the first act, at trial, a bank representative testified that its loan commitment to the Coutos was irrelevant to the bank's decision. As to the second act, there was evidence to support the finding that Silvestri inaccurately told the Coutos that, if they did not agree to the restructured deal, they could lose $100,000 in deposits. Regarding the third act, the trial court found that Silvestri's conduct in welding shut the Coutos sewer access was a "blatant attempt" to force money and, thus, an unscrupulous business practice. Silvestri virtually admitted this fact on cross-examination by counsel for the Coutos. Specifically, Silvestri was asked the following question: "So basically. . . you blocked the sewer connection . . . in order to get [the] Couto[s] to pay Joseph General . . . $50,000, correct?" Silvestri responded to this question by stating: "Yes." Finally, regarding the fourth act, the subsequent contractor hired by the Coutos testified that there were a significant number of objects buried where the carriage house was to be built. It is a fair inference that the debris was either dumped by Silvestri or by someone else at his direction.

[9] In a subsequent case, the Appellate Court, citing *Sturm* and another case involving a tort; see *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 105; held summarily that a corporate officer could be held individually liable for a CUTPA violation based on fraudulent misrepresentations that he had made in his corporate capacity. *Cohen* v. *Roll-A-Cover, LLC*, 131 Conn. App. 443, 468–69, 27 A.3d 1, cert. denied, 303 Conn. 915, 33 A.3d 739 (2011). The Appellate Court apparently assumed that a CUTPA claim is a tort such that the common-law rule necessarily applied. The Appellate Court's opinion did not acknowledge our reservation of that question in *Sturm*, which expressly indicated that the question of CUTPA liability in such circumstances remained unresolved. Over the years, a number of trial court decisions have held that a corporate owner or officer may be held individually liable for a CUTPA violation committed in his corporate capacity, without requiring satisfaction of the test for piercing the corporate veil. See, e.g., *Meneo* v. *Patrick*, Superior Court, judicial district of Hartford, Docket No. CV-06-5004523-S (March 23, 2007) (manager and sole member of limited liability company may be held individually liable under CUTPA based on conduct in which he personally participated); *Pfeifer* v. *Legault & Son Construction*, Superior Court, judicial district of Tolland, Docket No. CV-05-4002595-S (October 26, 2006) (stating that " 'a corporate officer or employee who participates in an unfair or deceptive practice in the course of conducting the business of his or her principal may be liable under CUTPA, at least if the participation is knowing and intentional' "), quoting R. Langer et al., 12 Connecticut Practice Series: Unfair Trade Practices (2003) § 6.7, pp. 427–28; *Silber* v. *Carotenuto & Sons General Contractors, Inc.*, Superior Court, judicial district of New Haven, Docket No. CV-98-0416562-S (February 8, 2000) (corporate owner and officer may be liable for corporate CUTPA violations in which he participated); *Bardon Tool & Mfg. Co.* v. *Torrington Co.*, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. CV-96-0473455-S (October 31, 1996) (individual officers of corporation may be liable under CUTPA without veil piercing); *Sabo* v. *Automated Light Technologies, Inc.*, Superior Court,

judicial district of Waterbury, Docket No. 0110800 (June 3, 1994) (corporate director may be held liable under CUTPA for tortious misrepresentations he made on behalf of corporation); *Vitano, Inc.* v. *Townline Associates*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-89-028136-S (August 2, 1991) (corporate president liable under CUTPA for fraudulent misrepresentations made in corporate capacity). At times, the reasoning has been extended to corporate employees. See *Wall* v. *Post Publishing Co.*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-91-037579-S (March 26, 1992) (employees may be personally liable under CUTPA when they participate in, control or direct unfair acts or practices of defendant corporation); see also *Pabon* v. *Recko*, 122 F. Supp. 2d 311, 313 (D. Conn. 2000) (employee of debt collection agency could be held liable for CUTPA violation).

[10] The federal act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce . . . ." 15 U.S.C. § 45 (a) (1). It allows for government enforcement, but unlike CUTPA, it does not create private causes of action. See *Naylor* v. *Case & McGrath, Inc.*, 585 F.2d 557, 561 (2d Cir. 1978).

[11] We are also persuaded by the overwhelming number of sister state decisions addressing causes of action under state unfair trade practices acts that are in accord with our decision. See *People* v. *Toomey*, 157 Cal. App. 3d 1, 8, 203 Cal. Rptr. 642 (1984) (affirming finding of individual liability of corporate officer where officer actively participated in misleading advertising and sales solicitations even after issuance of injunction); *Hoang* v. *Arbess*, 80 P.3d 863, 868–69 (Colo. App. 2003) (finding liability for officer of limited liability corporation where manager was "personally involved in each step of the construction, chose the individual home sites, oversaw the subcontractors, set policies and procedures for the subcontractors to follow, and visited the construction sites at least once a week"), cert. denied, Colorado Supreme Court, Docket No. 03SC338 (Colo. December 1, 2003); *Ayers* v. *Quillen*, Docket No. 03C-02-004RFS, 2004 WL 1965866, *4 (Del. Super. June 30, 2004) ("[T]he definition of 'any person' is broad enough to include an agent of a corporation who is responsible for consumer fraud under the terms of the [the Delaware Consumer Fraud Act]. . . . However, it is not enough that the officer, director, agent or other employee know of the deception. Rather, [the officer] must be shown to have been actively involved in the alleged violative activity." [Internal quotation marks omitted.]); *K.C. Leisure, Inc.* v. *Haber*, 972 So. 2d 1069 (Fla. Dist. App. 2008) ("[A]n individual may be liable for corporate practices . . . once corporate liability is established. In order to prove individual liability it is necessary to show that an individual defendant actively participated in or had some measure of control over the corporation's deceptive practices."); *People ex rel. Hartigan* v. *All American Aluminum & Construction Co.*, 171 Ill. App. 3d 27, 33, 524 N.E.2d 1067 (1988) (holding officers, one of whom was controlling shareholder, were properly named as parties in action alleging violation of Illinois unfair trade practices statute); *State* v. *McKinney*, 508 N.E.2d 1319, 1321–22 (Ind. App. 1987) (holding individual officer personally liable for penalties and restitution under Indiana deceptive consumer sales act where officer was the corporation's sole employee, determined content of mailings and advertisements, decided which supplies to use, took money out of corporation account for personal use, and, although not attorney, submitted appellate brief on behalf of corporation); *Advanced Construction Corp.* v. *Pilecki*, 901 A.2d 189, 195 (Me. 2006) ("[t]he individual liability stems from participation in a wrongful act, and not from facts that must be found in order to pierce the corporate veil"); *MaryCLE, LLC* v. *First Choice Internet, Inc.*, 166 Md. App. 481, 528, 890 A.2d 818 (2006) ("officers and agents of a corporation or limited liability company may be held personally liable for [violations of Maryland Consumer Protection Act] when they direct, participate in, or cooperate in the prohibited conduct"); *Community Builders, Inc.* v. *Indian Motorcycle Associates, Inc.*, 44 Mass. App. 537, 560, 692 N.E.2d 964 (1993) ("[i]t is settled that corporate officers may be held liable under [Massachusetts consumer protection statute] for their personal participation in conduct invoking its sanctions"); *Luckoski* v. *Allstate Ins. Co.*, 5 N.E.3d 73, 85 (Ohio App. 2013) ("in contracting with the [plaintiffs, the contractor] personally took part in the commission of, or cooperated and directly engaged in, violations of [the Ohio Consumer Sales Practices Act] and he can be held liable for damages that resulted from his violations, regardless of whether or not his actions were calculated to take advantage of the [plaintiffs]" [internal quotation marks omitted]); *Berrett* v. *A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 156 (Pa. Super. 2012) (finding managing member's deceptive acts exposed him to personal liability); *Plowman* v. *Bagnal*, 316 S.C. 283, 286, 450 S.E.2d 36 (1994) ("directors

and officers are not liable for [a] corporation's unfair trade practices unless they personally commit, participate in, direct, or authorize the commission of a violation of the [South Carolina Unfair Trade Practices Act]"); *Miller* v. *Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) ("[The agent] personally participated in the sale of every home sold to the homeowners. He personally made the representations about the size of the lot and the location of the fence. He is the only person with whom the homeowners had any contact. Based on the plain language of the statute, [the agent] is liable for his own [Texas Deceptive Trade Practices Act] violations."); *Grayson* v. *Nordic Construction Co.*, 92 Wn. 2d 548, 554, 599 P.2d 1271 (1979) ("if a corporate officer participates in wrongful conduct or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for the penalties"); see also D. Belt, "Unresolved Issues Under the Unfair Trade Practices Act," 82 Conn. B. J. 389, 408 n.110 (2008); but see *Unit Owner's Assn. of Summit Vista Lot 8 Condominium* v. *Miller*, 141 N.H. 39, 44, 677 A.2d 138 (1996) (holding that New Hampshire consumer protection statute "does not contain a specific provision that allows individuals to be held liable for the acts of the 'corporate' entity absent application of the veil-piercing doctrine").

[12] As we have previously stated "in the absence of aggravating unscrupulous conduct, mere incompetence does not by itself mandate a trial court to find a CUTPA violation." *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 229.